This suit is brought for the purpose of determining the respective rights of the borough of Lincoln Park, in the county of Morris, and the township of Wayne, in the county of Passaic, to collect taxes upon certain lands owned by the complainants. Both municipalities claim the right to assess and collect taxes on these lands, and their rights are dependent upon whether the lands are located in Morris or Passaic county, and this fact is further dependent upon the location of the county line dividing the two counties at the point where the borough of Lincoln Park and the township of Wayne adjoin each other on the fourth course of the territorial description of the borough of Lincoln Park, as contained in the act by which that borough was incorporated in 1922. See P.L. 1922 p. 240. That course, which is the only pertinent part of the territorial description of said borough, reads as follows:
"Thence, northerly along the middle of the Pequannock river, the various courses thereof, following the Passaic county line, to a point in the middle of said Pequannock river, where the same is intersected by the southerly boundary line of the proposed Pompton borough."
This course is the east boundary of the borough of Lincoln Park and the west boundary of the township of Wayne. The land in question lies wholly west of the Pequannock river, as it now flows. It has always, or, at least, from time out of mind, been assessed for taxes in the township of Wayne, and taxes have been paid to that township by the owners until after 1923, when the borough of Lincoln Park also assessed the land as a part of its territory and asserted its right to collect taxes thereon. Both municipalities claiming the right to the assessment and collection of taxes on these lands, the owner refused to pay taxes to either, which eventually resulted in the filing of this bill and the issuance of an order of this court restraining proposed tax sales by both municipalities, and all proceedings for the collection of the taxes assessed by either.
It is the contention of the defendant township of Wayne *Page 574 
that at the time of the creation of Bergen county in 1709, out of which county Passaic county was formed in 1837 (2 Comp. Stat. p.1687; P.L. 1837 p. 96), the Pequannock river, which is now a dividing line between the two counties of Passaic and Morris, as it flowed past this property, did not run along its present course, but ran to the west thereof, and that, therefore, as the fourth course of the territorial description of the borough of Lincoln Park follows the Passaic county line, the lands in question are necessarily in the township of Wayne, in the county of Passaic. This contention is denied by the defendant borough of Lincoln Park, which asserts that the main branch of the Pequannock river has always been where it is now, and that, therefore, the property in question is within the territorial limits of that borough and the county of Morris, which county was formed in 1738. Rev. 1877 p. 200.
Bergen county was created by an act entitled "An act for dividing and ascertaining the boundaries of all the counties in this province, passed January 21st, 1709." 1 Rev. 1877 p. 198; 2Comp. Stat. p. 1676. There the boundaries are defined as follows:
"That in the eastern division, the county of Bergen shall begin at Constable's hook and so run up along the bay and Hudson's river to the partition point between New Jersey and the province of New York, and so run along the partition line between the provinces, and the division line of the eastern and western divisions of this province, to Pequaneck river; and so run down the said Pequaneck and Passaick river to the sound; and so to follow the sound to Constable's hook where it began."
Passaic county was formed from Bergen and Essex counties, and the property in question was originally in Bergen county. P.L.1837 p. 98; Rev. 1877 p. 204; 2 Comp. Stat. p. 1687. The fifth course of the territorial description of Passaic county, as contained in said act, reads as follows: "Thence, up said river along the line between Bergen and Morris counties, to Sussex county." "Said river" refers to the Pompton river, by which name the Pequannock river is sometimes known. *Page 575 
The contention of Wayne township is that if the original boundary line of Bergen county, which afterwards became the dividing line between Passaic and Morris counties, was formed by what is claimed to have been the original main branch of the Pequannock river, that line is still the county boundary line and the dividing line between the two defendant municipalities, on the theory that "where boundary lines have once been fixed a subsequent change in the status of the waters, whether by artificial means or through natural causes, will not have the effect of shifting the boundaries." 5 Cyc. 898. The defendant borough claims, however, that even if the old channel branch of the Pequannock river were the main branch of that river, and, therefore, the county boundary line, the natural closing up of this old channel and the diversion of all of the waters of this river into the east branch of the river created a change in the boundary line of the county. It appears beyond question that the Pequannock river, as it flowed the lands in question, formerly divided into two branches at this point, the westerly branch going to the westward of the lands in question and the easterly branch flowing to the eastward of said lands. The first point to be determined, therefore, is which of these branches was originally, and at the time of the fixing of the boundaries of Bergen county in 1709, the main branch. It is not disputed that since 1837, when Passaic county was formed, and up until 1922, when the defendant borough was incorporated, the lands in question have been considered as a part of Passaic county. All deeds and other records concerning these lands, and filed or recorded since 1837, have been filed and recorded in the Passaic county offices, with, perhaps, one exception, viz.: a deed referred to by the witness Jenkins, the record of which in Morris county was examined by him when seeking information from which he prepared his map. The state tax assessment map and the Wayne township tax assessment map show the lands as a part of Wayne township, in the county of Passaic. The old river bed, that is, what is sometimes referred to as the "West Branch," has been adopted as the county dividing line generally by the people in this locality since 1709, and up until the incorporation of the borough of *Page 576 
Lincoln Park in 1922. The only testimony indicating that locally the county line was considered in any different location was that given by the witness Vermeule, but his testimony was as to his conclusion from information which he said he had obtained at the time he made a survey. He did not detail the information upon which that conclusion was based nor give its source. Opposed to this is the testimony of the witness Demarest, who was eighty years of age at the date of the hearing, coupled with the fact that the deeds and other records concerning the lands have uniformly, with one exception, been filed and recorded in the county of Passaic. On February 6th, 1847, the commissioners appointed "in the matter of the division of lands of the late Peter Courter, deceased," which included the lands in question, filed their report in the Passaic county surrogate's office. The map of this division, also filed in that office and referred to in the report, was offered in evidence in this cause and markedExhibit D 6. That map clearly indicates the west branch of the "Pacquanac" river as the main branch. The lands here involved were a part of the Courter lands divided by those commissioners. They were then evidently considered as being located in Passaic county, or the proceedings would not have been taken in the orphans court of that county. It is also undisputed that the so-called east branch of the Pequannock river is now the main branch and that the west branch referred to as the old river bed is dry except at flood periods.
There is but one witness (Jenkins) who contends that the so-called old river bed was not formerly a branch of the Pequannock river. He contends that this so-called branch was only a sort of an overflow area and did not extend to the Passaic river south of the property in question. The witness Jenkins bases his conclusion partly upon the fact that there are a number of large trees, apparently of the age of between sixty and seventy years, located in the so-called old river bed; and the witness Vermeule also testified to the existence of at least one tree, the age of which he fixes at seventy years, and upon which fact he in part bases his conclusion as to the location of the county boundary line. The witness Demarest, who is upwards of eighty years of age, *Page 577 
testified to the fact that as far back as his memory extends the main branch of the Pequannock river was located where it is now and that the so-called old river bed or west branch has, during the period of his recollection, been flowed with water only during flood periods; but that Mr. Demarest's father told him that in his day there was as much water running in the west branch as there was in the east branch, and that he used to go duck hunting in that branch and paddled around it in a boat, and that because he was troubled by cows running through the river, he felled some big trees at the mouth of the west branch, which changed the course of the river so that it thereafter flowed solely through the east branch.
The witness Kynor, who is one of the officers of the company which recently purchased the Courter property, the lands in question, testified that prior to this purchase in 1925 he interviewed Mr. Walter Courter, one of the owners of the land in question, who was then about eighty years of age, and that Mr. Courter pointed out the old river bed as the westerly boundary line of the Courter property, and that he, Kynor, thereafter walked along this river bed.
The witness Vermeule was formerly attached to the New Jersey geological survey bureau and the department of conservation and development, and the New Jersey geological survey and topographical map of this section of New Jersey was made under his supervision. This was in 1887 and the property was resurveyed in 1898-1903 and the map revised in 1908. It is claimed that this map shows the property in question as located in Morris county and not in Passaic; but the map is not at all conclusive, nor is it clear that it indicates what is claimed for it. It is drawn to a very small scale and admittedly was made many years, at least fifty, and perhaps a hundred years, after the alleged change in the flow of the river had taken place. It may show physical conditions as they actually existed when made, but it throws very little light on conditions as they existed fifty or one hundred years before. It was entirely natural for this engineer to locate the county line where he did in view of the physical conditions *Page 578 
which he saw. But I cannot assume that his opinion, based on information acquired in the locality at the time of making the survey, was correct, nor that the information itself, which is not detailed, was entirely reliable. Especially is this so in view of the strong weight of evidence pointing to the contrary.
The testimony of Vermeule himself, and the theories advanced by him and offered on behalf of the defendant borough of Lincoln Park, in my judgment, tend more to the support of the contention of the township of Wayne than it does to that of the borough of Lincoln Park. He testified that he has been perfectly familiar with the particular section of New Jersey which is here in controversy, since 1879; that when the topographical or geological map was made in 1887 he located the county line in what he found to be the main channel of the Pequannock river at that time. But these boundaries are paper boundaries only, and should not prevail against actual physical boundaries which have been so long recognized in the community. He testified as follows:
"The channel on the west which has been variously referred to here has not, during my personal knowledge of the river, ever been a real active channel except at very high stages. * * * That channel, from recent examination, shows unmistakably there was a channel there of some capacity, and at some time in the past, but apparently long in the past, a considerable time back. The evidence of the upper end of the channel is plainly that there has been a gradual accretion of sand. There is no other evidence there whatever of a sudden change in the channel. There has been a gradual accumulation of sand in the upper part of the channel near the upper end, is entirely filled, and then it tapers off from that point to partially filling the channel. In that part of the channel I saw one tree particularly that is an old tree. * * * I should say that tree is certainly seventy years old. * * * It [the west channel] is filled up entirely with sand, the characteristic sand that the Pompton river brings down. * * * If I should assume that the westerly channel at some time or other carried as much water as the easterly channel, nevertheless, under that condition, the easterly channel, through gradual erosion, would have become the larger channel and would have gradually robbed the western channel of water, the reason being that the measured distance through this extreme west channel is just almost exactly twice the distance through the east channel. The fall being the same from the head of one to the foot, naturally the fall, or what we called the hydraulic slope, the fall per unit of *Page 579 
distance would be twice as much in the easterly channel as in the westerly channel. The result of that from well-known rules in hydraulics would be that at all stages of the river the velocity in the east channel would be forty per cent. greater, forty-one per cent. exactly greater than it would be in the extreme westerly channel, the rule being that the valocity of the stream varies as the square root of the fall per unit of distance, which makes it just forty-one per cent. if the fall is twice as much. Forty-one per cent. greater. Under those conditions the more rapid velocity always causes greater erosion and the erosion in the easterly channel would have been more rapid than in the westerly channel, and that channel would have gradually, through erosion, become the main channel of the river, and as soon as it abstracted most of the water from the westerly channel, then this accretion of sand in the westerly channel would inevitably take place. During floods the velocity would slacken at that point and the water would drop its sand. It can only carry sand with certain velocity, and the moment the velocity is checked the sand must drop. That is the way that deposit has been formed, without a doubt."
This is important testimony, and in connection with other testimony indicates very clearly to my mind that at some time the west branch, known as the old river bed, was the main branch of the Pequannock. Other evidence indicates that the old river bed is even now wider than the east branch, and the witness Jenkins testified that the east branch has undoubtedly been materially widened in recent years by the flow of water through it, there being a gradual erosion, and that this is indicated by the presence of large and small rocks near the present center of the east branch. Considered in view of the testimony concerning the felling of trees at the mouth of the west branch by the witness Demarest's father and other testimony with respect to the sinking of an old canal boat in the west branch, suggest the natural processes and result detailed by the witness Vermeule. It was inevitable under these circumstances that the main course of the river be changed, the easterly branch being the shorter and the water flowing more rapidly through that to the Passaic river, naturally deepened that branch and widened it, and as it was deepened and widened the west branch was robbed of its water. The fact that the west branch was gradually closed by accretion and by the slow deposit of sand from the Pompton river by slow moving water did not shift the boundary line. The boundary line as it was originally located *Page 580 
in the old river bed is still in the same place. The gradual closing of the west channel by accretion did not result in a gradual shifting of the boundary line. Such gradual shifting of boundary lines would be accomplished only where the banks of the river were gradually built up on one side or eroded on the other. If the west bank of the old branch were gradually built up by accretion and the east bank gradually eroded so that this branch itself was gradually shifted to the eastward, that would result in the shifting of the boundary line. But where there are two branches of a river, the main branch constituting the boundary line and the subsidiary branch having no importance as a boundary, the closing of the main branch, either by artificial or by natural means, whether the result of accretion or avulsion, does not result in the shifting of the boundary lines. It seems to me that Vermeule's testimony as to the process of the closing of the west branch and the opening of the east branch strongly supports the contention of the defendant Wayne township and indicates that the old river bed or west branch was closed gradually or by artificial means. The gradual erosion or accretion which changes boundary lines is not that which fills up one branch and thus diverts the water to another branch. In such a case the boundary lines remain the same as though the course had been changed by avulsion. The fact that trees sixty to seventy years old are now found in the old river bed does not prove that the old river bed was not the main branch of the Pequannock river in 1709. Their existence is entirely consistent with the testimony showing the location of the county boundary lines in the old river bed. So far as is indicated by the evidence the west branch has been practically closed for more than seventy years and trees such as are now found in the old river bed may have grown there since that time.
Since writing the foregoing conclusions I have visited thelocus in quo in company with counsel representing the contending parties, and am now quite convinced that the opinion I had already formed, as indicated by the foregoing, is correct. The signs of the old river bed are unmistakable; its *Page 581 
width equals, if not exceeds, the present bed; its banks are as high and bold, if not higher and bolder, in places than those of the present river bed. The large trees located in the old river bed and which were referred to by some witnesses as indicative of the length of time elapsed since water flowed in that bed, are no larger than some now located on small islands in the present river bed, and no doubt there were anciently small islands in the old river bed supporting these trees which have now grown to great age and size.
This court ought not to arbitrarily change county or municipal boundary lines which have for many years, in this case for upwards of two centuries, been recognized in the community as the actual boundary lines and formed the basis of taxation during that period. I will, therefore, advise a decree for an injunction perpetually restraining the defendant borough of Lincoln Park from assessing or collecting taxes on the lands in question.