WILLIAM E. FRANK ET AL., APPELLEES AND CROSS-APPEL-
LANTS, V. SAM SMITH ET AL., APPELLEES AND CROSS-APPPEL-
LEES: VERA GARVER, INTERVENER, CROSS-APPELLEE: TERRY
CARPENTER ET AL., APPELLANTS AND CROSS-APPELLEES.
293 N. W. 329

FILED JULY 5, 1940.   NO. 30871.

*Mothersead & York,* for appellants.

*Floyd E. Wright* and *Jack E. Lyman,* for cross-appellants.

*Jack L. Raymond* and *Frank Glebe,* for appellees.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

Plaintiffs William E. Frank and George J. Carpenter brought this action against Sam Smith and Anna Smith, his wife, *et al.,* defendants, and Terry Carpenter and Hazeldean Carpenter, his wife, defendants. The purpose of the action is to quiet title to certain lands, described in plaintiffs' petition, in which they claim to own the fee by adverse possession. The plaintiffs prevailed in the district court, with the exception that defendants Smith prevailed as against the plaintiffs. No controversy was presented as between defendants Smith and defendants Carpenter. The plaintiffs cross-appeal from the judgment in favor of defendants Smith, and defendants Carpenter appeal from the judgment against them and in favor of the plaintiffs.

In addition to the foregoing statement with reference to plaintiffs' action, the petition alleges that defendants Sam and Anna Smith are the owners of lot 2, as designated on the map, exhibit 1, but claim to own certain real estate, shown on the map, east of highway No. 29, between Gering and Scottsbluff, Nebraska, and north, in the northeast part of lot 2. Defendants Smith in their answer admit the ownership of plaintiffs in lot 1, except the strip of land, as shown by the map, in lot 2 in which they claim ownership by adverse possession, and admit their ownership of lot 2; and pray that plaintiffs' cause of action be dismissed as to them. Defendant Terry Carpenter admits the ownership of certain land described in plaintiffs' petition, further alleges

that said land extends south of the center of the main channel of the North Platte river as said channel existed prior to the construction of the present cement bridge, denies his ownership casts any cloud on any land that plaintiffs may own, prays the dismissal of plaintiffs' petition with prejudice, and for such other relief as may be just and equitable. In addition to the adverse possession claimed by plaintiffs, the case was tried upon the theory of whether or not there was accretion to the lands of the plaintiffs; this apparently with the consent of the defendants Carpenter, no objection appearing in the record as to the taking of testimony on this issue. Likewise, such issue was argued to this court and appears in the briefs of the parties plaintiff and defendants Carpenter.

Exhibit No. 1 is a map, drawn to scale of 200 feet to the inch, which is here reproduced, and the scale thereon is in exact proportion to the size of the original exhibit.

The map covers all of section 26 and the north 40 rods of section 35. Forty-acre tracts are indicated in each quarter of section 26. The North Platte river is shown by solid black ink and constitutes the part of the river having water in it at the time of the survey, made in the forepart of 1938. The white spaces inside of the solid black portion are islands. The crisscross lines at the bottom, or to the south, of the exhibit comprise lot 1 in section 35, owned by the plaintiffs, consisting of seven acres of deeded land. The diagonal lines north of lot 1, appearing principally in section 26 and slanting from a heavier black line to the point of the present river, and the same lines appearing east of highway No. 29, as designated, and on a part of lot 2 constitute the land claimed by the plaintiffs.

The cement bridge, as designated, running north and south, is the present bridge across the North Platte river between Scottsbluff and Gering, and was constructed in 1920 or 1921. From the cement bridge the angular line, designated "State and Federal Highway No. 29," is the present paved highway constructed at the same time. West of the highway, the direction designated on the map, are

two shaded lines running west and southwest, designating an earthen dike, raised on the west and north in some places with concrete blocks. This dike connects with two narrower shaded lines, the latter running from the extreme west line of the map in a southeasterly direction through lots 1 and 2 to the extreme east side of the map, and designated as the "Central Irrigation District Canal." On each side of the river the map discloses block lines, running across the map ("Original Survey Meander Line"), taken from original field notes of the government survey. Close to such lines are solid lines, running across the map, marked "Old River Bank." On the south side of the river is another line, running across the map, which designates the river bank at the time the concrete bridge (the present bridge) was built. The north and south sides of the river are designated as such and denote the outside boundaries of that part of the river having water in it at the time the survey was made. The east line of the map is the section line of sections 26 and 35.

Exhibit 2 is a photograph of the North Platte river between Scottsbluff and Gering, taken in June, 1889, showing the condition of the river at that time. It shows a continuous stream of water from the south to the north bank, designated on the map as the "Old River Bank" (north) and "Old River Bed" (south). The total distance between the meander lines as shown on the map, on the north and south sides of the river, is 3,250 feet. The distance between the old river line on the north side and the old river line on the south side, as shown by the map, is 3,090 feet. The distance from the present north bank of the river to the point of intersection of the long dike, as designated on the map, is 1,050 feet.

The first bridge across the river was built in 1889-1890 on the east section line of section 26. An old mill was located at the south end of the bridge, as well as a spillway, shown on the map, in the southeast corner. At such point the Central Irrigation Canal came up to the old river bank, as designated on the map, and made the fall for the old mill

race. The second bridge across the river was constructed in 1908 or 1909 on a line between lots 1 and 2 of section 35, west of the first bridge. At the time the second bridge was constructed, a fill, approximately 800 feet long, was put in on the south side of the river, and at the time of the construction of the present cement bridge and fill the old fill was extended until it was approximately 2,100 feet from the old south bank. The present bridge was built approximately 1,050 feet in length. Other physical factors to be considered in connection with the case are the old Pathfinder dam and reservoir, constructed in Wyoming in 1909, and the Tri-State ditch and government canals, not shown on the map. The purpose of the Pathfinder dam was to reserve the water of the North Platte river. The record shows that the reservoir had considerable effect on the river; that when the storage water was released it was then taken up during the irrigation season by ditches, and since the construction of the reservoir the heaviest flow of water was along the north side of the river, the Tri-State ditch and other government canals taking and using water during the irrigation season. The Central Irrigation District at different times constructed seven or eight spillways which extended from the first spillway constructed to a point approximately one mile and a half farther west, on the south side of the river, this having a tendency to cause sediment and silt to form and fill up that portion of the river from which the water was diverted, and, as each spillway was constructed, the same process prevailed. Two miles west of the present bridge, and not shown on the map, the Central Irrigation District had an obstruction which extended out into the river for a few hundred feet, thus diverting the water to the north. The plaintiffs claim that such obstruction caused accretion to form in the river as far down as the bridge, resulting in building up the south channel of the river and causing the channel to become more shallow and lower by crowding the flow of the river to the center or north.

The North Platte river is a wide, shallow, nonnavigable

stream. The dike, called the longest dike, as designated on the map, was constructed for the purpose of throwing the water in the river to the north, to protect the fill and to force the flow of water under the new concrete bridge. The obstructions placed in the river were so placed by artificial means by parties other than the plaintiffs.

At the time the concrete bridge was constructed, there were channels practically from the line marked "Old River Bed" clear over to the present north bank, and during a period of the year there would be water flowing in all of such channels. During low water, some of the channels would go dry; most of the water would flow on the north side. Due to the nature of the river, it is possible to narrow its channel, and the dikes and obstructions referred to did narrow its channel, the result being that, by lessening the amount of water, the land, referred to on the map and claimed as accretion, together with other lands, became usable; trees, willows and brush grew on this land, cattle and horses were pastured on this land for 20 years or more. There remains some water on certain parts of the land used by the public for fishing and swimming, and some people picnicked on this land. The foregoing constitutes the substance of the evidence in this voluminous record with reference to accretion.

"Accretion is the process of gradual and imperceptible addition of solid materials, called alluvion, thus extending the shore line out by deposits made by the contiguous waters." *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N. W. 647.

"This loss of contact of a certain line with the water results from one of three causes: First, accretion, or the gradual and imperceptible addition to the land by the deposit of silt and sediment along the edge of the water, so' that the land is extended into the water. Second, reliction, or the gradual withdrawal of the water from the land, by the lowering of its surface level from any cause." 1 Kinney, Irrigation and Water Rights (2d ed.) p. 928.

The formation of land by accretion has been repeatedly

defined, and we shall not add to the long list of authorities by further citation. Avulsion is defined in 6 C. J. 876, as follows: "The removal of a considerable quantity of earth from the land of one proprietor and its deposit upon, or annexation to, the land of another suddenly and by the perceptible action of water; the sudden and rapid change of the channel of the stream which is the boundary, whereby it abandons its old and seeks a new bed."

The facts in the instant case fail to disclose avulsion in any particular; rather, the process was gradual and imperceptible by the deposit of the solid material called alluvion. Such deposits attached to plaintiffs' land. The additional effect of the obstructions during the course of time caused the land to become uncovered by the gradual subsidence of the water. This would be reliction, and the same law applies to both of these forms of addition to real estate which are held to be the property of the abutting landowner. See 1 R. C. L. 226, sec. 1.

"Where the water of a river gradually recedes, changing the channel of the stream and leaving the land dry which was theretofore covered by water, such land belongs to the riparian proprietor." *Topping v. Cohn,* 71 Neb. 559, 99 N. W. 372; followed in *Conkey v. Knudsen,* 135 Neb. 890, 284 N. W. 737. That the accretion or reliction was caused by other than natural causes does not affect the rule of accretion.

In the case of *County of St. Clair v. Lovingston,* 23 Wall. (U. S.) 46, the question involved was the right to accretion which had been formed by reason of obstructions placed in the river, the contention being that the accretion was caused wholly by such obstructions, and that the rules upon the subject of alluvion would not apply. The court said (p. 66): "The proximate cause was the deposits made by the water. The law looks no further. Whether the flow of the water was natural or affected by artificial means is immaterial. (Citing *Halsey v. McCormick,* 18 N. Y. 147; 3 Washburn, Real Property, 58, 353.) * * * The test as to what is gradual and imperceptible in the sense of the rule

is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." There is generally in all matter of increase of banks always a more gradual and imperceptible process, especially so in a river possessing the character of the North Platte river, and the evidence in the instant case meets the test, as stated in the above case.

In 1 R. C. L. 233, sec. 7, it is said: "But if the accretion is indirectly induced by artificial conditions created by third parties it would seem that the right of the riparian owner to such accretion would not be affected, and such appears to be the holding of a majority of the cases." In support of the foregoing are cited *Lovingston v. County of St. Clair,* 64 Ill. 56, 16 Am. Rep. 516, and note (*County of St. Clair v. Lovingston, supra*) ; *Adams v. Frothingham,* 3 Mass. 352, 3 Am. Dec. 151, and other authorities.

*County of St. Clair v. Lovingston, supra,* was cited with approval by this court in *Gill v. Lydick,* 40 Neb. 508, 59 N. W. 104, to the effect that whether the accretion is from natural or artificial causes makes no difference; the result as to the ownership in either case is the same.

In *Wiltse v. Bolton,* 132 Neb. 354, 272 N. W. 197, an ice gorge formed along land owned by the plaintiffs, and as a result the river shifted its main channel westward. When the ice disappeared there was left a narrow channel, a slough, along plaintiffs' land, and then a large sand-bar between the slough and the main channel of the river. As a result of the deposit of soil-building material during high water, the slough had gradually filled so that there was no channel and had not been for many years. By the same process the sand-bar had been built up until at the time of trial a large portion was suitable for cultivation. The court held that the lands in controversy were formed by accretion. The foregoing case sustains plaintiffs' contention on the above proposition of law.

The evidence in the instant case shows that the land involved was formed by accretion by the river receding from its former south bank in a gradual process, brought about

purely by the construction of irrigation works, dikes and the fills for the bridges. There was no rapid and sudden change of channels and the seeking of a new bed, as required in avulsion. We believe that, under the circumstances and evidence as disclosed, plaintiffs are entitled to the land in controversy, and as described in their petition, by accretion, and that in such respect the trial court did not err.

Defendants Carpenter objected to proceeding with the trial of this action as an action in equity, and to trial without a jury, and demanded a jury trial, which was not granted by the court. They cite section 6, art. I of the Constitution, which in part reads: "The right of trial by jury shall remain inviolate," and in support thereof *Krumm v. Pillard,* 104 Neb. 335, 177 N. W. 171. A careful reading of this case discloses that it does not support appellants' contention in such respect. The following sections of the statute govern:

Section 76-401, Comp. St. 1929, provides: "An action may be brought and prosecuted to final decree, judgment or order, by any person, or persons, whether in actual possession or not, claiming title to, or an estate in real estate against any person or persons who claim, or apparently have, an adverse estate or interest therein, for the purpose of determining such estate or interest; and canceling unenforcible liens, or claims against, or which appear to be against, said real estate, and quiet the title to real estate." And section 76-409, Comp. St. 1929, provides: "The court shall try such cause in like manner as other equitable actions and shall enter therein such orders and decrees as the parties may be entitled to. Appeals from final orders may be had as in other actions."

Each party in the case at bar is seeking equitable relief and each invoking the aid of a court of equity. The court properly denied a trial by jury. See *Sittler v. Wittstruck,* 122 Neb. 452, 240 N. W. 562; *Morse v. Cochran,* 131 Neb. 424, 268 N. W. 307.

Defendants Carpenter further contend that the boundary

line between the two tracts of land, that is, the tract owned by them and that owned by plaintiffs, is the center of the bed of the North Platte river at the time the survey was made and the lands were patented. The following language from the case of *Commissioners v. United States,* 270 Fed. 110, expresses the general rule on this subject: "(1) That where the thread of the main channel of the river is the boundary between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel." The opinion further explains a change by sudden and violent processes of avulsion, with which we are not here concerned, and states: "To this rule, however, there is a well-established and rational exception. It is that, where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening land, which never becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream." And in further support of their contention defendants Carpenter cite *Courter v. Lincoln Park,* 101 N. J. Eq. 572, 138 Atl. 99. The proof in the two cases above cited comes within the exception to the rule as heretofore announced. The proof on the part of defendants Carpenter is insufficient to come within this exception.

The United States supreme court in *Nebraska v. Iowa,* 143 U. S. 359, 12 S. Ct. 396, said: "It is settled law, that when grants of land border on running water, and the banks are changed by that gradual process known as accretion,

the riparian owner's boundary still remains the stream, although, during the years, by this accretion, the actual area of his possessions may vary. In *New Orleans v. United States,* 10 Pet. 662, 717, this court said: 'The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain.'" See, also, *Bouvier v. Stricklett,* 40 Neb. 792, 59 N. W. 550, which quotes and approves the language as above stated in *New Orleans v. United States, supra;* and *Gill v. Lydick, supra,* holding: "Where the water of a river recedes slowly and imperceptibly, changing the channel of the stream and leaving the land dry theretofore covered by water, such land belongs to the riparian proprietor. In case the alteration takes place suddenly, the ownership remains according to former bounds."

The trial court did not err in refusing to adopt the contention of defendants Carpenter with reference to the boundary line between the two tracts of land.

Plaintiffs cross-appeal from that part of the judgment in favor of defendants Smith, who own lot 2 and claim adverse possession of that part of lot 1 lying east of the highway fill and north of the river, as shown by exhibit 1. Plaintiffs contend that the evidence fails to prove adverse possession in Smith prior to the commencement of this action, but concede that Smith has had adverse possession of the disputed land since he acquired title in 1935.

An examination of the evidence discloses that Smith's predecessors in title, as well as he, at all times held such land as their own actually, openly, notoriously and exclusively, and remained in continuous possession thereof under claim of ownership during a period of more than 10 years. The land was inclosed and rent collected for pasture for

18 years. Some billboards were placed on the disputed land, and the parties owning them paid Smith and his predecessors in title rent during their respective ownership of the land, and all contracts with reference to the billboards were passed on to the succeeding owners, which included Smith.

In furtherance of their contention, the plaintiffs state that no privity existed between the possession of the Sowerwines, previous owners of the disputed land, and that of Smith, and, regardless of the possession the Sowerwines had, that Smith cannot tack such possession onto his possession for the purpose of completing 10 years of adverse possession.

"The title to land becomes complete in the adverse occupant when he and his grantors have maintained an actual, continued, notorious, and adverse possession thereof, claiming title to the same against all persons, for ten years." *Lantry v. Wolff*, 49 Neb. 374, 68 N. W. 494.

The proposition that a grantee may not take the adverse possession of his grantor over a strip of land not included in his deed is only a presumption of fact which yields to proof of the actual facts, and when overcome by such proof disappears. It is the fact when established that governs.

In *Rice v. Kelly*, 81 Neb. 92, 115 N. W. 625, this court held: "The rule sometimes announced that the adverse possession of land cannot be extended beyond the calls of the deed means that possession by construction cannot be extended beyond the calls of the written instrument by virtue thereof; but, if land be actually occupied·beyond the calls of the deed, hostile to the true owner, the written instrument does not preclude such occupancy from being adverse. The occupancy does not refer to the deed, but to the fact itself and its hostile character."

In the instant case, Smith did not claim privity under the deed alone, but also claimed that the area in dispute was actually occupied by his predecessors in title under claim of ownership, and the possession of the same was turned over by Mrs. Sowerwine to her children, and in turn by them to

him, when the different conveyances were executed. It is an actual occupancy which is turned over to each successor. The cross-appellants never occupied any of the disputed land, or made any claim to it, at least from and after the time the fill was constructed in 1921, but the defendant Smith and his predecessors did occupy the disputed land in such manner as to meet the requirements for vesting title by adverse possession. The trial court did not err in denying the cross-appeal.

For the reasons given in this opinion, the judgment of the district court is

AFFIRMED.