JOHN W. JAMES ET AL., APPELLEES, V. GEORGE H. MCNAIR, APPELLEE, IMPLEADED WITH PAUL E. WIRTH ET AL., APPELLANTS.

81 N. W. 2d 813

Filed March 8, 1957. No. 34014.

(1)

*Smith & Lebens* and *O'Sullivan & O'Sullivan*, for appellants.

*Edwin Moran* and *Wellensiek & Morrissey*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from a judgment of the district court for Otoe County quieting and confirming in John W. James and Vantine A. James, appellees here and plaintiffs below, the fee simple title to certain lands in that county as against Paul E. Wirth, John R. Wirth, and Anton F. Wirth, appellants here and defendants below, on the basis of adverse possession.

The lands involved are described by metes and bounds and are principally located in Section 5, Township 9, Range 14 East of the 6th P. M., in Otoe County, although it includes some land in Sections 4, 8, and 9 of

the same township and range where they lie adjacent to or corner on Section 5.

After judgment had been rendered by the trial court in favor of the plaintiffs, the defendants above referred to filed a motion for new trial and took this appeal from the overruling thereof.

George H. McNair was made a party defendant but no service was ever obtained on him; consequently, the appellees asked for and were granted leave to dismiss the action as to him, and did so. We shall not again refer to McNair in this opinion.

The judgment rendered by the trial court, which dismissed appellants' cross-petition for want of equity, denied appellants any right in and to that part of these lands which they claimed by adverse possession and also under certain quitclaim deeds.

The first question raised relates to the sufficiency of the evidence adduced by appellees to sustain the trial court's decree in their favor, which is based on adverse possession. Adverse possession is complete when, as stated in Frank v. Smith, 138 Neb. 382, 293 N. W. 329, 134 A. L. R. 458: " 'The title to land becomes complete in the adverse occupant when he and his grantors have maintained an actual, continued, notorious, and adverse possession thereof, claiming title to the same against all persons, for ten years.' Lantry v. Wolff, 49 Neb. 374, 68 N. W. 494."

Since this is an equitable action it will be reviewed here de novo. However, in view of the record, which discloses that the trial court viewed the entire premises, we think the following principles have particular application:

" 'While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue,

consider the fact that the trial court observed the witnesses and their manner of testifying.' 'Gentry v. Burge, 129 Neb. 493, 261 N. W. 854." Higgins v. Adelson, 131 Neb. 820, 270 N. W. 502.

"This court has held that, when the court views the topography of a certain locality, its findings are entitled to great weight." Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647.

The evidence is in irreconcilable conflict on many material matters. We have come to the conclusion that appellees' version of what happened is correct, so will set forth the facts accordingly as it would serve no useful purpose to set out appellants' evidence that is in conflict therewith. We can only say we think appellants, and some of their witnesses, were either mistaken as to what they testified to in regard to certain material matters or otherwise misrepresented the facts as they relate thereto.

In 1856 the United States government surveyed Section 5, which became a part of Otoe County. At that time the Missouri River cut across the section from northeast to southwest, and this created many irregular tracts which were identified as Government Lots. The area left in what would have been the south half of the northeast quarter was identified as Government Lot 6, the area left in what would have been the north half of the southwest quarter was identified as Government Lot 7, and the area left in what would have been the south half of the southwest quarter was identified as Government Lot 8. Section 5 apparently remained in this condition until 1911. Then the river started cutting toward the west. It continued to do so until about 1920. At that time it had washed away all of Section 5 except a small tract in the extreme northwest corner thereof and possibly a small area on the western edge of Government Lot 7 or the north half of the southwest quarter.

Insofar as the record shows, and is here material, at the

time this change in the course of the river took place George S. Upton owned Government Lot 7, Lot 4 in Government Lot 6, Lots 7, 8, and 10 in Government Lot 5, and Lot 6 in Government Lot 3; Charles Boardman apparently owned Government Lot 8; appellees' father owned a 20-acre tract in the northwest quarter, apparently being Lot 5 of Government Lot 3 or the north half of the northeast quarter of the northwest quarter; and Caleb Eaton's father owned land in the northeast quarter and, also, land in Cass County lying immediately adjacent thereto on the north. The latter was also washed away between 1911 and 1920.

Shortly after 1920 bars began to form in the river where this land had washed away. By 1928 the bars had formed considerable of an island, with the main channel of the river to the east thereof. However, a chute some 300 to 400 feet wide remained on the west side of the island or between it and the west bank. A considerable area had built back in between the west line of Section 5 and the west bank of this chute before the island formed.

In 1928 Caleb Eaton moved onto the north end of this island, occupying it as far south as the east-west center line of Section 5 if extended east across the chute to the river. He built a home on the island north of the section or county line. Medford James, no relation of the appellees, moved onto the island in 1929 and occupied land lying south of the east-west center line of Section 5 if extended east across the chute to the river. He built a cabin on the land he occupied in 1930 and moved his family into it in 1931, that being the first year he raised a crop. About 3 years later he built a 4-room tile house for his family. He occupied the island as far south as a division fence which he and Charles Boardman built about 1934. This is the present south line of the land claimed by appellees. Medford James cleared about 60 acres on the land he claimed, which extended east from the chute to the river and north from the

division fence, which he and Boardman built, to the half section line. He stayed on the land until he sold it in 1938. Appellees went on the island in 1931 and cut some cottonwoods for use as lumber. They did so in both 1931 and 1932. They occupied an area south of the tract their parents had owned before it washed away. In 1933 they started a garden on it. Later about 40 acres were fenced. They have always continued to occupy and farm it, being land east of the chute, west of the land occupied by Raymond Kinnison and Riley Eaton, and continuous south as far as the land occupied by Medford James. Raymond Kinnison, a nephew of Caleb Eaton, moved onto the island in 1932 and occupied a strip some 37 rods wide just north of that occupied by Medford James. He did so pursuant to an agreement with Caleb Eaton. Kinnison moved onto this land with his family in 1932 and cleared about 21 or 22 acres the following year. He continued to farm it until he sold it in 1938. At that time he had cleared about 56 acres thereof. Riley Eaton, a brother of Caleb Eaton, moved onto the land just north of Raymond Kinnison shortly after the latter came onto the island. Riley did so pursuant to an agreement with Caleb Eaton. He occupied a strip about 60 rods wide and claimed it from the chute east to the river. He continued to farm it until he sold it in 1941.

Due to the fact that he lost most or all of his crop in the years 1936, 1937, and 1938 as a result of floods, Medford James sold his interest in the land he was occupying to Edwin Moran, Wilber Fey, and appellee Vantine A. James. The deed was executed on August 10, 1938. On November 21, 1938, Raymond Kinnison sold his interest in the land he was occupying to the same grantees. Thereafter, on December 8, 1938, Edwin Moran conveyed his interest in the foregoing lands to appellee John W. James. Wilber Fey and appellee Vantine A. James, in the fall of 1938, put in a wheat crop on the lands they had acquired from Medford James

and Raymond Kinnison. However, it was destroyed by a flood in the spring of 1939. As a result Wilber Fey deeded his interest in the foregoing lands to appellees. The appellees also acquired the interest of Riley Eaton by deed executed April 10, 1941. The appellees put in wheat on the land they then owned in the fall of 1939, 1940, 1941, 1942, 1943, and 1944. However, due to floods, they never harvested a crop. It should here be stated that appellants worked for appellees on this island during some of these years, helping clear land, prepare it for crops, and put in crops. They were paid for doing it. During this time they made no claim of ownership but recognized that of appellees, in fact, they rented some of it from appellees in 1940 and 1941 and put in corn but only raised a crop in 1940.

As a result of these continued years of crop losses, due to floods, appellees, beginning with 1945, decided to let the cleared land grow back to weeds, willows, and other vegetation in the hope that it would cause silt to deposit thereon during flood stages of the river and thus build it up above the ordinary flood stage. To assist this plan they killed the willows on their lands in 1948 by spraying them, doing so in order to develop a denser growth of vegetation. Nothing further happened until 1951 when the appellants had a survey made and thereafter started to clear part of the island claimed by appellees. When, in 1952, they rented this cleared area to Wilber Fey and he informed appellees of that fact, the background for this litigation started. Appellees advised appellants of their claimed rights and when appellants would not respect them appellees instituted this action. It was started on December 11, 1954.

We said in Frank v. Smith, *supra,* that: " 'Where the water of a river gradually recedes, changing the channel of the stream and leaving the land dry which was theretofore covered by water, such land belongs to the riparian proprietor.' Topping v. Cohn, 71 Neb. 559, 99 N.

W. 372; followed in Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737." However, title to an island may be acquired by adverse possession. See, Briard v. Hashberger, 107 Neb. 199, 185 N. W. 430. In regard to what constitutes adverse possession we said in Lantry v. Parker, 37 Neb. 353, 55 N. W. 962: "The law does not require that possession shall be evidenced by a complete enclosure, nor by persons remaining continuously upon the land, and constantly from day to day performing acts of ownership thereon. It is sufficient if the land is used continuously for the purposes to which it may be in its nature adapted." We think the evidence adduced by appellees discloses that they and their predecessors in title have, for more than 10 years, maintained such an actual, continued, open, and exclusive possession of the land they are now claiming that they are entitled to have their title thereto quieted and confirmed. In this respect we have not overlooked the fact that appellants, and their predecessors in title, paid taxes on part of this land over a period of years, as did appellees. Such payment, while indicative of a claim of ownership, does not overcome the actual ownership of appellees obtained by adverse possession. As to the effect thereof see Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331.

But appellants contend appellees are estopped from asserting the claim they here make because of their relationship to appellants in connection with the interests appellants acquired from Charles Boardman in 1940 and from the George S. Upton heirs in 1949. Their contention is based on the claim that when a client engages an attorney to transact some legal business for him the attorney cannot remain silent, when he has a duty to speak, and thereafter claim as his own properties which were the subject of his employment, for to permit him to do so would be a constructive fraud upon the client. We have said in regard to the latter that:

" 'Constructive or legal fraud may be found from the relation of the parties to a transaction, or from circum-

stances and surroundings under which it takes place. The conscience is not necessarily affected by it, and it may exist without any fraudulent intent. * * *' Lake Hiawatha Park Assn. v. Knox County Agricultural Society, 28 Ohio App. 289, 162 N. E. 653." Johnson v. Radio Station WOW, 144 Neb. 406, 13 N. W. 2d 556.

In Taxpayers' League v. Wightman, 139 Neb. 212, 296 N. W. 886, we held: " 'Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud-feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.' 26 C. J. 1061."

We have often set forth the duty of an attorney to his client. In this respect the Canons of Professional Ethics of the American Bar Association have, by official adoption, become the canons of ethics for the bar of this state. See Rules of the Supreme Court, Integration of the Bar, Article X.

Canon 6 of the foregoing provides in part: "It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel."

We held in Nebraska Power Co. v. Koenig, 93 Neb. 68, 139 N. W. 839, quoting from Wright v. Smith, 23 N. J. Eq. 106, that: " 'Every man has a trust to whom a business is committed by another. Every man is a trustee whose office is to advise or to operate, not for himself, but for others.' " We then went on to say: "The rules of equity which determine the consequences of acts performed by a fiduciary are not restricted to attorney and client, nor to similar conventional relations, but extend to all cases, where, on one hand, confidence is properly reposed, and, on the other, knowledge or

authority or influence arises from any cause. * * * A person gratuitously or officiously assuming as agent or trustee to control or manage the property or interests of another is as firmly bound by the implied terms of his confidential relation as one who is regularly employed and paid."

However, as stated in Petraborg v. Zontelli, 217 Minn. 536, 15 N. W. 2d 174: "The relation between an attorney and his client is one of highest trust and confidence, requiring the attorney to observe the utmost good faith and not to allow his private interests to conflict with those of his client. In re Estate of Lee, 214 Minn. 448, 9 N. W. (2d) 245. But where an attorney upon his employment makes full and frank disclosure as to his interests in the property involved in the subject matter of the retainer and the client desires the services of the attorney despite such interest and with full knowledge thereof, the attorney, under such circumstances, has the right to deal as he chooses with his own property. It is only when he has not advised his client of all the facts concerning his interest in the subject matter of the retainer or litigation that the court will closely scrutinize the transaction so as not to permit him to take advantage of his professional relationship in dealing with his client." The same would be true of an agent. See, Schultz v. Bleckwehl, 135 Neb. 94, 280 N. W. 257; In re Estate of Wiley, 150 Neb. 898, 36 N. W. 2d 483. As stated in In re Estate of Wiley, *supra:* "A fiduciary seeking to profit by a transaction with the one who confided in him has the burden of showing that he communicated to the other, not only the fact of his interest in the transaction, but all information he had which it was important for the other to know in order to enable him to judge of the value of his property."

The general rule is that in order to create an estoppel it is essential that the party against whom the estoppel is claimed acted with knowledge of the facts and asserted particular rights inconsistent with those subse-

quently claimed, and that the party claiming estoppel, being without knowledge or means of knowledge of the facts, was influenced by and relied upon the conduct of the person sought to be estopped, and changed his position in reliance thereon or acted upon it to his injury or prejudice. Sedlak v. Duda, 144 Neb. 567, 13 N. W. 2d 892, 154 A. L. R. 490; State ex rel. Truax v. Burrows, 136 Neb. 691, 287 N. W. 178; Peters Trust Co. v. Cranmore, 114 Neb. 491, 208 N. W. 635; Walker v. Ehresman, 79 Neb. 775, 113 N. W. 218.

And in Olds v. Hitzemann, 220 Ind. 300, 42 N. E. 2d 35, it was stated that: " 'The rule requiring the attorney to establish the fairness and honesty of the transaction does not apply where the attorney has openly assumed an attitude hostile to the client, before the transaction was entered into, so that thereafter the parties are put at arm's length and the client could not possibly have been acting under the influence of the confidence which he had reposed in the attorney.' 7 C. J. S., § 127(b), Attorney and Client, p. 967."

The record discloses that when appellees and appellants were boys their families were neighbors living on farms located near Nebraska City and they grew up as close friends. Appellee Vantine A. James was licensed to practice law in this state in 1932 and thereafter did so at Nebraska City. As such he became appellants' legal adviser on many matters, they usually going to him for advice. On the other hand appellants did a great deal of work for appellees in many different places and of many different kinds, including the work hereinbefore referred to which appellants performed for appellees on the island.

In 1940 the appellants, by quitclaim deed from Charles and Rachael Boardman, husband and wife, dated April 23, 1940, acquired whatever interest the Boardmans then had in and to about the south 93 rods of the land which the appellees now claim to own on the island. Because of appellee Vantine A. James' connection with this mat-

ter appellants contend appellees are now estopped from making any claim thereto for, to permit them to do so under the circumstances shown by the record, would be a fraud upon appellants. In connection with discussing this transaction we shall refer to appellee Vantine A. James as James.

The record shows that in the early spring of 1940 Charles Boardman came to the office of James in Nebraska City; that he told James he wanted to sell him whatever land he owned on the island south of the division fence; that James advised appellants of Boardman's desire, appellants having previously expressed to James a desire to acquire some land on the island; that James told appellants he would step aside if they wanted it; that appellants and James went out and inspected the land, James showing appellants the division fence to which he advised appellants appellees claimed to own the land on the island; that both James and appellants, because of the nature of the terrain, were mistaken as to where the north line of the Boardman land was located and consequently none of them were aware of the fact that the description in the deed by which appellants subsequently acquired Boardmans' interest covered part of the land which the appellees claimed to own; that James closed the deal, taking the deed already referred to in the name of the appellants and paying the Boardmans the agreed consideration of $250; that James had the deed recorded; and that appellants repaid the consideration. From that time on until 1951 all parties recognized the line between their lands as this division fence which had been built by Medford James and Charles Boardman about 1934, although appellants contend they did not know of the mistake made until about 1952 when they were advised thereof by their then counsel. In Schultz v. Bleckwehl, *supra,* we said: " 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent

by the other so to act.' Restatement, Agency, sec. 1."

We do not think the relationship of appellants and James in connection with this transaction was that of attorney and client but rather that of a gratuitous agent; however, the duty would be the same. We think James made a full and frank disclosure to the appellants as to the interests appellees claimed in the land involved, although there was a mutual mistake in relation to what area the description in the deed would cover. However, all parties recognized what they considered to be the other's rights in this area for over 10 years. Under such circumstances we do not think estoppel arises, nor do we think appellants were defrauded for they got exactly what they thought they were getting when they went out and looked at the land and saw where the division line was located.

"* * * it is the established rule in this state that, when a fence is constructed as a boundary line fence between two properties, and where the parties claim ownership of the land up to the fence for the full statutory period and are not interrupted in their possession or control during that time, they will, by adverse possession, gain title to such land as may have been improperly inclosed with their own. Carnahan v. Cummings, ante p. 337; Krumm v. Pillard, 104 Neb. 335; Zweiner v. Vest, 96 Neb. 399; Andrews v. Hastings, 85 Neb. 548." Pfeifer v. Scottsbluff Mortgage & Loan Co., 105 Neb. 621, 181 N. W. 533. See, also, Hallowell v. Borchers, 150 Neb. 322, 34 N. W. 2d 404.

As held in Purdum v. Sherman, *supra*: "Where one by mistake as to the true boundary line enters upon and takes possession of lands of another, claiming it as his own to a definite and certain boundary, by an actual, open, exclusive, and continuous possession thereof under such claim for 10 years or more, he acquires title thereto by adverse possession."

With reference to the 1947 deed, which appellants obtained from the Boardmans, we do not think either of

the appellees was connected with this transaction in such a manner as to create any fiduciary relationship between the parties. It is true that appellee Vantine A. James drew the contract and prepared the deed but he did not put a description in either instrument. When and by whom the description of the land conveyed thereby was put in the deed is not too clearly shown. It was apparently done by the party who closed the deal. Under the circumstances disclosed by the record, as they relate to this transaction, we do not think appellants gained any rights in and to the lands herein involved by reason thereof.

We have already referred to the land in Section 5 that was owned by George S. Upton prior to its being washed away. George S. Upton died on March 4, 1934, and his wife in 1944. During September and October of 1949 appellants bought from the heirs of George S. Upton whatever interests they had in and to this land. It is contended that appellee Vantine A. James handled this transaction for the appellants. We do not think the record shows that he did. However, let us assume that he did. We do not think that would help appellants. Prior to their purchasing the Uptons' interests the appellants advised appellee Vantine A. James of the fact they intended to do so, stating the Uptons claimed they owned lands east of the chute. On at least two occasions, prior to their purchase of the Uptons' interests, appellee Vantine A. James advised appellants that the Uptons had no rights east of the chute as that land belonged to appellees. Under this situation we do not think appellants are in a position to claim anything by estoppel by reason of their subsequent purchase. All they got was what the Uptons had and that was land west of the chute.

In view of what we have said we will not discuss such matters as the claimed settlement agreements of 1952 and 1953; admissions made by the appellants to employees of the Hart Construction Company; and appel-

lants' endeavors to purchase the land from appellees. To do so would serve no useful purpose. Our findings fully support the judgment of the trial court. It is therefore affirmed.

AFFIRMED.