Louis J. Worm, appellee, v. Johanna C. Crowell et al.,
appellees, Impleaded with Frederick Pace Woods et al.,
appellants.
87 N. W. 2d 384

Filed January 3, 1958.    No. 34267.

(713)

*O'Hanlon & O'Hanlon,* for appellants.

*Walter G. Huber* and *Cranny & Moore,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Wash-

ington County. It involves an action brought by Louis J. Worm whereby he seeks to have quieted and confirmed in himself his title in and to "The Northeast Quarter of the Southwest Quarter (NE¼SW¼) and the Southeast Quarter of the Northwest Quarter (SE¼ NW¼) and Government Lots One (1) and Two (2) in Section Twenty-five (25) in Township Eighteen (18) North, Range Twelve (12) East of the 6th P. M. in Washington County, Nebraska, and the accretions thereto directly East of these Government Lots to the West bank of the Missouri River" on the basis that he is the record title owner of the described lands in fee and therefore entitled to all accretions thereto, and that he and his predecessors in title have been in the adverse possession of all of the lands for more than 10 years.

Defendants Frederick Pace Woods, Olive Black Woods, Marilyn Woods Kilbourne, Mark William Woods, and Marjorie William Woods, who are the owners of the west half of the northwest quarter of said Section 25, filed an answer and cross-petition alleging themselves to be the owners of the "Southeast Quarter of the Northwest Quarter and Government Lots One and Two in Section 25, Township 18 North, Range 12, East of the Sixth Principal Meridian in Washington County, Nebraska, and the accretions thereto directly East of said Government Lots to the West bank of the Missouri River." Their claim of ownership thereto is based on the contention that it belongs to them as accretions to the land they own and also by reason of adverse possession. They ask that the title thereto be quieted and confirmed in them. We shall herein refer to these defendants as the Woods and to the west half of the northwest quarter of Section 25 as the Woods 80.

Defendant Blanche E. Jones, owner of the northwest quarter of the southwest quarter of said Section 25, filed an answer and cross-petition alleging she is the owner of "The North 600 feet of the Northeast Quarter of the Southwest Quarter of Section 25, Township 18

North, Range 12, East of the Sixth Principal Meridian in Washington County, Nebraska, and all accretions thereto, directly East of said above described real estate to the West bank of the Missouri River, * * *." She claims the same by accretion to her land and by adverse possession. We shall herein refer to the northwest quarter of the southwest quarter of Section 25 as the Jones 40.

Plaintiff, by his replies, generally denied the claims made by the foregoing defendants.

The trial court rendered a default judgment in favor of the plaintiff and against all the defendants who had been properly served and had failed to answer or appear, including certain cotenants of the plaintiff. That such can be properly done if the facts so justify see Severson v. McKenzie, 122 Neb. 827, 241 N. W. 774.

At the trial it was "stipulated by and between the parties that for the purpose of this lawsuit that accretion lands be considered as being directly east of the riparian land instead of being measured by a proportional basis to eliminate extensive measurement of the original 1856 survey line and the subsequent lines of the river and the present boundary of the Missouri River."

The cause was tried on the issues raised. During the course of the trial the judge personally viewed the premises. The trial court found generally for the plaintiff and against the answering defendants and rendered a decree accordingly, quieting and confirming in the plaintiff title to the lands he claimed to own and dismissing the cross-petitions of the Woods and Blanche E. Jones. From this decree the Woods and Blanche E. Jones have perfected this appeal.

Appellee contends there is no proper bill of exceptions for this court to consider and that consequently he is entitled to have the judgment rendered by the trial court affirmed because his pleadings are sufficient to support it, citing Wabel v. Ross, 153 Neb. 236, 44 N. W. 2d 312, and Jones v. City of Chadron, 156 Neb. 150,

55 N. W. 2d 495, to that effect. As stated in Jones v. City of Chadron, *supra:* "In the absence of a bill of exceptions, it is presumed that an issue of fact presented by the pleadings was established by the evidence, that it was correctly decided, and the only issue that will be considered on appeal is the sufficiency of the pleadings to support the judgment." This claim of appellee is based on the theory that since the bill of exceptions was not presented to and settled by the trial judge until 11 days after it was returned by appellee's attorney to the attorney for appellants it did not meet the requirements of section 25-1140.05, R. R. S. 1943. This statute provides in this respect that: "The bill and proposed amendments must, within ten days thereafter, be presented by the party seeking the settlement of the bill to the judge who heard or tried the case, * * * at which time the judge shall settle the bill of exceptions."

Sections 25-1140 to 25-1140.07, R. R. S. 1943, provide the statutory steps for the allowance and settlement of a bill of exceptions in case of an appeal. Section 25-1140, R. R. S. 1943, provides for an initial 40-day period from the date of appeal, here May 17, 1957, for the preparation of the bill of exceptions. Section 25-1140.07, R. R. S. 1943, provides the trial judge may, upon a showing of due diligence, extend the time for this purpose up to a maximum of 40 days. That was done and the time for preparing the bill of exceptions was thus extended to August 5, 1957. The bill was prepared by the reporter within that time and delivered to the attorney for the appellants on that day. Section 25-1140.03, R. R. S. 1943, provides 10 days thereafter, or in this case to August 15, 1957, for serving the bill of exceptions on the adverse party or his attorney of record. That was done here on August 13, 1957, or within time. Section 25-1140.04, R. R. S. 1943, provides 10 days within which the adverse party shall return the bill of exceptions. That would here be August 25, 1957. It was returned on August 23, 1957, or within time. Section

25-1140.05, R. R. S. 1943, then provides as hereinbefore set forth. In this case that was September 4, 1957. The bill of exceptions was allowed and settled by the trial judge on September 3, 1957, or within time.

It is apparently appellee's thought that by returning the bill of exceptions to appellants' attorney on August 23, 1957, he could thereby accelerate the date for its allowance and settlement. But such is not the fact. As we said in Neighbors & Danielson v. West Nebraska Methodist Hospital, 162 Neb. 33, 74 N. W. 2d 854: "* * * the aggregate time allowed for the performance of any of the statutory steps in securing an allowance of a bill of exceptions will not be shortened, or advanced, by completing any of the steps enumerated in advance of the time limited by the statute." Appellee's contention in this respect is without merit and our review on this appeal will be de novo since this is an equitable action. See James v. McNair, 164 Neb. 1, 81 N. W. 2d 813.

In doing so we shall consider the following principles:

"While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue, consider the fact that the trial court observed the witnesses and their manner of testifying." Johnson v. Erickson, 110 Neb. 511, 194 N. W. 670. See, also, McDermott v. Boman, ante p. 429, 86 N. W. 2d 62; James v. McNair, supra; Hehnke v. Starr, 158 Neb. 575, 64 N. W. 2d 68.

"This court has held that, when the court views the topography of a certain locality, its findings are entitled to great weight." Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647. See, also, James v. McNair, supra; Hehnke v. Starr, supra.

It should be understood that these principles are

merely standards to be considered by us in weighing the evidence adduced and in no way are they conclusive in regard to the result which we must ultimately reach. In the latter respect it is our duty to arrive at an independent conclusion based solely on the record before us.

Section 25, Township 18 North, Range 12 East of the 6th P. M., as originally surveyed in 1856 when Nebraska was a territory, was not a full section because it was cut by the Missouri River on which it bordered. As a result certain tracts of irregular shape were given numbers instead of the usual subdivision descriptions. The lands lying to the east of the northwest quarter of the northwest quarter thereof, consisting of a triangular tract of 22.60 acres, was designated Lot 1; the lands lying to the east of the southeast quarter of the northwest quarter thereof, consisting of a triangular tract of 28.80 acres, was designated as Lot 2; and the irregular tract lying east of the northeast quarter of the southwest quarter thereof, consisting of 56.10 acres, was designated as Lot 3. On July 20, 1868, the northeast quarter of the southwest quarter and the southeast quarter of the northwest quarter of Section 25, together with Lots 1 and 2 thereof, containing a total of 130.90 acres according to the official plat of the survey thereof by the Surveyor General, were patented to Constant Cachelin. Through various means of conveyance the title to these lands became vested in appellee except for certain cotenants whose rights, if any, have already been referred to as having been defaulted herein. Whenever it is convenient to do so we shall herein refer to these two 40-acre tracts claimed by appellee as appellee's north or south 40. It was stipulated that the Woods own the west half of the northwest quarter of Section 25 and that Jones owns the northwest quarter of the southwest quarter thereof. The first evidence of the Woods ownership of this 80-acre tract is a warranty deed dated February 26, 1921, conveying to Mark W. Woods

it and other real estate. The Woods also own a large number of acres of land lying immediately to the west and north of the lands here involved. The Jones 40 has been in the Jones family since at least 1926.

The first question presented by this appeal is, did the Missouri River, after these lands were patented to Constant Cachelin, ever move far enough west so that the Woods land and the north 600 feet of the Jones land became riparian to the right or west bank thereof and, if it did, did appellee and his predecessors in title ever regain the ownership thereof by adverse possession? Second, if the river did not go far enough west to cause the Woods and Jones lands to become riparian, did either of these parties (appellants) become the owners of the land they here claim by adverse possession?

There are some basic principles applicable to the foregoing questions which we will cite before entering into any discussion of the facts relating thereto. They are as follows:

"Where, by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner." Frank v. Smith, 138 Neb. 382, 293 N. W. 329, 134 A. L. R. 458. See, also, Gill v. Lydick, 40 Neb. 508, 59 N. W. 104; Topping v. Cohn, 71 Neb. 559, 99 N. W. 372; Kinkead v. Turgeon, on rehearing, 74 Neb. 580, 109 N. W. 744, 121 Am. S. R. 740, 7 L. R. A. N. S. 316; Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737; Conkey v. Knudsen, 143 Neb. 5, 8 N. W. 2d 538; Ohm v. Clear Creek Drainage Dist., 153 Neb. 428, 45 N. W. 2d 117. As stated in Kinkead v. Turgeon, *supra:* "* * * the rights of riparian owners upon the Missouri river to land formed by accretion are the same as if the river were not navigable, and that the common law applies in full force."

When, by gradual erosion, a river becomes the boundary of land the owner thereof then becomes a riparian

owner and is entitled to all accretions thereto. See, Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636; Wiltse v. Bolton, 132 Neb. 354, 272 N. W. 197; Conkey v. Knudsen, *supra;* Dailey v. Ryan, 71 S. D. 58, 21 N. W. 2d 61. As correctly stated in Dailey v. Ryan, *supra:* "It is the settled law of Nebraska that erosion of a river, which cuts entirely across riparian land and into the land of an adjoining owner, operates to obliterate the title of him whose land was originally riparian, and that he may not reassert his title if the river thereafter reverses its transverse wanderings and new land is formed within what were his original boundaries."

"A subsequent conveyance by such grantee, without describing such lands by metes and bounds, but by the number or numbers by which the same are designated in the government survey, passes the title, not only to the land originally constituting the grant from the United States, but to the accretions thereto." Topping v. Cohn, *supra.* And such would be true if the grantee died intestate and property he owned was inherited by his heirs at law.

"The claim of title to land by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for the statutory period of 10 years." Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331. See, also, McDermott v. Boman, *supra.*

The possession is sufficient if the land is used continuously for the purpose to which it may be in its nature adapted. See, James v. McNair, *supra;* Walker v. Bell, 154 Neb. 221, 47 N. W. 2d 504. As stated in Walker v. Bell, *supra:* " '* * * Ordinarily the law does not undertake to specify the particular acts of occupation by which alone title by adverse possession may be acquired since the existence and establishment of the continuity must necessarily depend greatly on the circumstances of each case, and the use to which the property is adapted, the actual manner of its use, the circumstances of the occupant, and to some extent his intention must be

considered. * * *.' 2 C. J. S., Adverse Possession, § 125, p. 681."

"It is the established rule in this state that when a fence is constructed as a boundary line fence between two properties, and where the parties claim ownership of the land up to the fence for the full statutory period and are not interrupted in their possession or control during that time, they will, by adverse possession, gain title to such land as may have been improperly enclosed with their own." James v. McNair, *supra*. See, also, Horbach v. Miller, 4 Neb. 31; Levy v. Yerga, 25 Neb. 764, 41 N. W. 773, 13 Am. S. R. 525; Tourtelotte v. Pearce, 27 Neb. 57, 42 N. W. 915.

"* * * taxation of the land for a series of years to the person claiming it, and the payment of taxes by him are competent evidence tending to show ownership." Horbach v. Miller, *supra*. See, also, Walker v. Bell, *supra*.

"The title to land becomes complete in the adverse occupant when he and his grantors have maintained an actual, continued, notorious, and adverse possession thereof, claiming title to the same against all persons, for ten years." Lantry v. Wolff, 49 Neb. 374, 68 N. W. 494. See, also, Walker v. Bell, *supra;* James v. McNair, *supra*.

A person claiming title by adverse possession must establish it. Hehnke v. Starr, *supra;* McDermott v. Boman, *supra*. As held in Hehnke v. Starr, *supra:* "One claiming ownership of real estate by adverse possession must recover upon the strength of his title and not because of a possible weakness in the title of his adversary." And: "A person claiming title by adverse possession must to establish it prove open, notorious, exclusive, continuous, and adverse possession of the real estate, claiming title to the same against all persons for the full period of 10 years." See, also, McDermott v. Boman, *supra*. The same would be true of claims based

on the rights of a riparian owner to accretion, that is, he must establish his right thereto.

"If the adverse possession of the occupant is a continuation of the possession of a prior adverse possessor claiming title, and such occupant claims title from such prior possessor, then the possession of the occupant may be tacked to that of such prior possessor." Walker v. Bell, *supra.*

As already stated the patent granted Constant Cachelin to this land in 1868 was based on the government survey of 1856. Thereafter the federal government apparently again surveyed this area in both 1879 and 1890 for a map of this area of the Missouri River published in 1893 cites as reference for the source thereof as to topography to a "survey of 1879" and as to shore line to a "survey of 1890." This map shows the land patented to Cachelin in 1868 as almost completely intact and the topography shows no high bank across the lands now owned by either the Woods or Jones. It does evidence the fact that in 1890 the lands patented to Cachelin in 1868 were apparently still in existence. The next map introduced in evidence by appellee is one based on a survey by the United States Corps of Engineers in October 1923. This map, in addition to showing the river as it then existed, also shows the river banks as of 1890. The topography shown thereon discloses no high bank across appellants' lands. It does show that most of the land originally patented to Cachelin in 1868 to be in existence. The same is true of the maps of the United States Corps of Engineers dated April 27, 1932, based on their "Topographic Survey" of this area except that it does disclose a bank running from the river northwesterly across the southwest corner of appellee's south 40 and extending up onto the Jones 40. The same is true of the United States Engineers' map of 1946-1947 except that it does not show this bank. Based solely on these maps it would seem that the patented land, or at least the major part there-

of, has always remained intact. It is, however, apparent from these same maps that no survey of this area was made by the federal government between 1890 and 1923. This is the period during which appellants contend the patented land, or at least all but a very small portion (about 3 acres) in the southwest corner of appellee's south 40, was washed away.

To cover this period appellee, who had been familiar with the land he now claims to own since 1909, produced himself and others as witnesses who testified they had been familiar with it prior to 1909 and one of whom testified he had been familiar with it even before the turn of the century. They all testified to the effect that the river had never been as far west as any part of the western boundary of the land patented to Constant Cachelin and never farther to the west than the eastern part of the two 40-acre tracts and Lot 1 thereof.

Appellants produced witnesses on this issue, including appellant Frederick Pace Woods who testified he had been familiar with the river at this point since 1913. The other witnesses produced testified they had been familiar with the river at this point since shortly after the turn of the century and one of them testified he had been familiar with it even before that. These witnesses testified to the effect that they had observed the river when its west or right-hand bank was on and across the Woods 80, stating the river was then flowing across the 80 from the north in a southerly direction; that it continued its flow onto and across the Jones 40 in a southeasterly direction until it crossed the east line thereof at a point 600 feet south of the northeast corner thereof; and that it flowed from there onto and across the appellee's south 40 in a southeasterly direction, leaving intact only a very small part of the 40-acre tract, which small tract was located in the southwest corner thereof.

Appellants introduced in evidence a photostatic copy of page 269 of book No. 1 of the official survey records

of Washington County. It represents field notes made by W. H. Hill, county surveyor of Washington County, at the request of M. T. Murphy and, according to the heading thereon, relates to Sections 23, 25, and 26 in Township 18 North, Range 12 East of the 6th P.M. They are dated as having been made on April 11, 1888. When these field notes are extended to the area it places the west bank of the Missouri River at that time at a point 130 feet west of the northwest corner of appellee's south 40. A photostatic copy of a page covering Section 25, taken from the County Surveyor's Irregular Tracts Drawing Book found in the office of the county clerk of Washington County, shows in pencil a meander line of the Missouri River in 1895 as running across the Woods 80 from north to south and then, as it enters onto the Jones 40, angling to the southeast across it and the appellee's 40, leaving only a very small tract of the latter located in the southwest corner thereof. There is also a County Surveyor's Irregular Tracts Drawing Book in the office of the county surveyor. It is the county surveyor's duty to take care of both books and make all entries therein. However, no such meander line was placed across this land in Section 25 in the book kept in the county surveyor's office. The official tax records of DeSoto precinct in Washington County, wherein this land is situated, also evidences the fact that the river, at some time, changed its course and washed away almost all of the land patented to Constant Cachelin because, for a long period of time, only a fractional part (3 acres) of appellee's south 40 was assessed for taxation purposes. Considering the way in which this land was assessed over the years herein involved we do not think the payment of taxes thereon by either the Woods or appellee to be very significant. A plat book of Washington County, including this area, which was put out by the C. H. Scoville Co. of Blair, Nebraska, and Philadelphia, Pennsylvania, in 1908 shows the change in the course of the

river as claimed by appellants. This map was never adopted by any public authority as an actual map of the conditions of this real estate. It was found stored in the vault of the county surveyor as part of the records of his office although he testified it was not a part of his official records. A map of a survey made by Christ Rohwer, a civil engineer, dated November 23, 1910, was also introduced in evidence. It is based on the field notes of a survey of land then apparently owned by C. H. Blakeslee located to the north and northwest of Section 25. The map, as drawn, includes Section 25. Christian or Christ Rohwer had been county surveyor of Washington County prior thereto. The field notes are a part of the survey records of Washington County but they are not considered official records of the office. A map of Washington County put out in 1916 by M. H. LaDougeur was also received in evidence. The evidence shows the county surveyor has the same map in his office. This documentary evidence all shows the change in the river which appellants claim occurred and on which they base their claim of being riparian owners.

These documents are not all official documents and admissible, as such, when proper foundation therefor has been laid. As to the admissibility of official documents see sections 25-1278, 25-1279, 25-1281, 25-1284, and 25-1292, R. R. S. 1943. Some of those that are not would be admissible under the authorities hereinafter cited. We shall consider only those that are admissible thereunder. Even though admissible they would not be conclusive of the issue here presented but the quality and weight thereof, for the purpose of our determining the issue to which they relate, is a matter for our consideration. As stated in Anderson v. Noleman, 90 Neb. 53, 132 N. W. 719: "Where the evidence relating to an issue of fact in an equity case is in direct conflict, the finding should be in favor of the party whose proofs are the more convincing, after all of the competent

testimony and the credibility of the witnesses have been considered."

"An exception to the general rule which requires maps, surveys, and the like, to be authenticated by the testimony of the party making the same exists where the documents are ancient. Maps, surveys, etc., purporting to be thirty years old or more are said to prove themselves and are admissible in evidence without the ordinary requirements as to proof of execution or handwriting if relevant to the inquiry, when produced from proper custody, on their face free from suspicion, and authorized or recognized as official documents." Annotation, 46 A. L. R. 2d 1320.

"An ancient map made under the direction of a private person, or one for which no official authorization or recognition appears, is inadmissible in evidence." Annotation, 46 A. L. R. 2d 1333.

"An ancient survey made by competent authority, recorded or accepted as a pubic document, and produced from proper custody, is admissible in evidence to prove the location of boundary lines." Annotation, 46 A. L. R. 2d 1336.

"An ancient survey which appears to have been made for a private purpose, and not officially authorized or recognized, is inadmissible as an ancient document." Annotation, 46 A. L. R. 2d 1338.

Stewart A. Smith, the county surveyor of Washington County, who examined and surveyed this area in 1956, said he encountered a definite change in elevation or a shelf therein at a point about 250 feet west of the northwest corner of appellee's south 40; that this shelf runs southwesterly from that point across the Jones 40 to where it crosses over onto appellee's south 40 at a point about 600 feet south from the northwest corner thereof; that this shelf or bank averages about 6 feet in height and is about 30 to 40 feet in width from top to toe; that it comes out of appellee's south 40 about 300 feet east of the southwest corner thereof; and that it

also traverses the Woods 80, doing so in a northwesterly to southeasterly direction.

Maurice E. Kirby, a qualified geologist, also examined this area in 1957 and noted this drop off or bank which he describes as being a drop of from 3 to 6 feet. He testified the land to the west thereof was level and being farmed; that the triangular piece remaining in the southwest corner of appellee's south 40 contained much older timber, including elms; and that on the land to the east thereof the trees were much younger and included only willows and cottonwoods. He also testified that in his opinion the land west of this bank had not been under water for at least 100 years. To the east of this bank he found a chute left by the river which, in flood times, still fills up with backwater from the river.

There is also an aerial map in evidence dated June 7, 1955, which fully supports this evidence. By a careful examination thereof this line can easily be observed.

We have fully and carefully considered all of the evidence. We realize the oral testimony in respect to whether or not the river ever crossed over onto appellants' lands is in irreconcilable conflict but, in view of the entire record, we think the following from 32 C. J. S., Evidence, § 763, p. 677, has application: "Documentary evidence relating to a long past event, prepared by parties not affected by it, and not appearing to have been changed, has great probative force, and is entitled to greater consideration than oral testimony as to circumstances, which occurred years ago, by witnesses subject to all the frailties of memories; * * *." We can come to no other conclusion than that at some time after 1879, and before 1923, the west or right-hand bank of the Missouri River crossed over onto appellants' lands and then, in moving back to the east, left the high bank which we have herein fully set out as to location. Thus the Woods 80 and the north 600 feet of the Jones 40 became riparian lands and the owners thereof, and their

successors in title, became entitled to all lands joining thereon to the east by either accretion or reliction. This would entitle appellants to have their title thereto quieted and confirmed in them unless they are prevented from doing so by appellee having been in adverse possession thereof for more than 10 years.

The evidence shows that about 1922 the Woods interests built a fence from near the southeast corner of their 80 out to the river and have maintained it in that location ever since. This fence was not built exactly on the east-west center line of Section 25 but just a little to the north thereof, being about 30 feet north thereof on the west end and 120 feet to the north thereof on the east end. After this fence was built the Woods used the land north thereof, which would include most of the area formerly occupied by appellee's north 40 and Lots 1 and 2 together with all lands east thereof, for varying purposes, including the pasturing of cattle, farming, cutting of wood, etc., and built a road thereon just north of this fence to permit them to so use it. We think, from 1922 on, the Woods have continuously used the land north of this fence for such purposes as, by its topography, it was naturally adaptable. During this time appellee and his friends used it only on occasions for hunting and fishing. We would find, if it were necessary to do so, that all land lying north of this fence belongs to the Woods by right of adverse possession.

As to the land south of this fence we think a different situation exists. It should first be stated that Lot 3, which, as originally platted, was to the east of appellee's south 40, completely disappeared when the river changed its course and the west bank thereof was across the Jones 40 and appellee's south 40. Consequently all land east of the west line of the appellee's south 40 is accretion land except a small acreage in the southwest corner thereof.

After appellee's father, E. A. Worm, and the other three grantees in that deed, acquired title in 1911 from

Urban Cachelin, son of Constant Cachelin, to whatever then remained of the patented land, they occupied and used it for recreation purposes, which included hunting, fishing, boating, etc. They used the cabin located thereon for that purpose, putting in a well in 1911 to be used in connection therewith. They also built a road from the cabin to a slough or chute, which lay to the east. At first they reached the cabin by a road coming in from the south. Then, in 1919, they built a road so they could get to the cabin from the north, coming in over the Jones 40 and the south 40 of the Woods land, which was then owned and occupied by a Mr. Swoboda. They also maintained a fence that had been put in along the south side of this south 40 before they purchased it, which fence extended east to the river. They put in and maintained a fence along the west side thereof. The area was, by nature, adapted to the recreational uses to which it was put. In this respect they later built a road thereon as far east as the river so they could get to it in connection with their hunting and fishing, putting in a temporary dock for their boat. We have already spoken of the fence on the north side of the south 40. We find Jones, and those in possession of her land, made little or no use of this area during these many years. We think the record entitles appellee to have his title quieted in and to the northeast quarter of the southwest quarter, together with all land lying to the east thereof as far as the west bank of the Missouri River and as far north as the fence that was constructed by the Woods just north of the center line of Section 25. Thus the appellee will be entitled to a small area just north of his south 40 acres and to the east thereof along the south side of this fence.

Having come to the conclusion that the trial court was in error in rendering the judgment that it did we set aside that judgment and remand the cause to it with directions to render a judgment in accordance with this opinion. As to costs the Woods should be relieved

thereof. In fairness to all parties we direct that one-half of the costs be taxed to appellee and one-half to appellant Jones.

REVERSED AND REMANDED WITH DIRECTIONS.