ROY WEMMER, APPELLANT, v. RALPH I. YOUNG ET AL., APPELLEES.

93 N. W. 2d 837

Filed December 26, 1958.    No. 34365.

*Theodore L. Richling* and *Joseph C. Hranac,* for appellant.

*Frederic J. Coufal, Cassem, Tierney, Adams, Kennedy & Henatsch,* and *Lloyd L. Pospishil,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This litigation was instituted by appellant to quiet title to the land he claimed to own described as Lot 5 of Section 12, Township 17 North, Range 4 East of the 6th P. M., Butler County, and all accretions north thereof to the center of the channel of the Platte River as against appellees and to have an easement in favor of appellant established across the land of Ralph I. Young and Anna M. Young, appellees, from the highway west thereof along the north line of the Young land to the property claimed to be owned by appellant. The easement has existed, as he asserted, for as much as 40 years as a means of ingress and egress to and from the property of appellant. He asked to have Ralph I. Young and Anna M. Young enjoined from in any manner interfering with the easement or its use as a way to and from the property of appellant and to recover from Ralph I. Young and Anna M. Young $900 which appellant claimed they, without authority or right, had collected and retained as rental from Harry A. Koch for the use by him of land which belonged to appellant.

Ralph I. Young and Anna M. Young, Albin Peltz and Ann Peltz, and Harry A. Koch, appellees, denied the claims made by appellant as a basis for the relief he demanded and they respectively by cross-petition alleged facts sufficient to entitle them to an adjudication quieting title in them respectively to the land they claimed to own as herein specified. Ralph I. Young and Anna M. Young will be hereafter designated as Young, Albin Peltz and Ann Peltz will be referred to as Peltz, and Harry A. Koch will be hereafter spoken of as Koch.

Young in his answer and cross-petition alleged that: He and his wife were the owners as joint tenants and in possession of Lots 1 and 2 and all accretions thereto, the south half of the northwest quarter and the north half of the northeast quarter including all accretions thereto, and the southwest quarter of the northeast

quarter of Section 13, Township 17 North, Range 4 East of the 6th P. M. in Butler County, including all islands and the bed of the Platte River lying north of the accretions to Lots 1 and 2 and the north half of the northeast quarter of Section 13 to the thread of the stream of the river except the part thereof sold to Harry A. Koch which was the north half of the north half of the northeast quarter of the northeast quarter of said Section 13 and the accretions thereto. W. A. Malovec and wife purported to convey by quitclaim deed to Koch the land lying and being between the north line of Lots 1 and 2 and the north half of the northeast quarter of Section 13 and the Platte River, said lands being accreted to said Lots 1 and 2 and the north half of the northeast quarter of said Section 13. At the time of the execution of the deed W. A. Malovec had no right, title, or interest in the lands involved in this litigation but the deed and the record thereof are a cloud on the real estate owned by Young as above described. At the time of the government survey of said Section 13 there existed between the north boundary thereof and the Platte River an area described in the survey as Lot 5. It commenced at a point on the north boundary of Lot 1 and extended eastward therefrom to the east line of Section 13. After the survey but many years prior to 1930 the Platte River by slow and imperceptible erosion of its south bank washed the bank to the south until it was entirely south of the original northern boundary of Lots 1 and 2 and was south of virtually all of the northern boundary of the north half of the northeast quarter of Section 13. Lot 5 as it existed north of Lot 1 was entirely washed away by the river and the part of Lot 5 north of the northeast quarter of Section 13 was virtually all washed away. Subsequent to the southernmost erosion of the south bank of the Platte River along the north edge of Section 13 the river began slowly to wash particles of soil against the said south bank where they adhered and by process of accretion began to

extend toward the north until said bank reached the location it now occupies. The district court for Butler County in an action therein brought and prosecuted by Frank W. Barcal, who was then the owner of the real estate now owned by Young, against Milo Evans, in which it was alleged that Milo Evans was claiming a part of said property, found and adjudicated that the title to the property involved therein should be and was quieted in Frank W. Barcal and that all the land that had existed between Lots 1 and 2 and the north half of the northeast quarter of Section 13 and the Platte River at the time of the government survey had long since washed away and was no longer in existence and no part of the land now lying north of Lots 1 and 2 and the north half of the northeast quarter of Section 13 was land that had existed at the time of the government survey. Island No. 1 divides the Platte River into two channels, one to the north and one to the south of it. Lying to the south and west of island No. 1 is another island the eastern end of which lies immediately south of the west end of island No. 1. The second island mentioned above has been for convenience identified as island No. 2. The thread of the stream of the Platte River west of island No. 1 is and had been before island No. 2 was formed north of island No. 2. The thread of the channel of the Platte River south of island No. 1 is and had been since before the formation of island No. 2 north of it. Young is the owner of the mainland south of island No. 2 and by virtue of such ownership Young owns to the thread of the stream of the Platte River including island No. 2. Young and his predecessors in title have for more than 40 years last past been in the open, notorious, actual, hostile, exclusive, and adverse possession under color of title of the property owned by Young as above stated. Young asked the court to quiet title to the property owned by him and to bar the plaintiff and the codefendants from asserting any claim therein or right thereto; to cancel the deed from W. A. Mal-

ovec and wife to Harry A. Koch; and to enjoin the appellant from asserting any right-of-way or easement in, to, or over the property of Young.

The cross-petition of Peltz asserted he owned Lots 2 and 3 south of the Union Pacific right-of-way and the accretion to Lot 1 in Section 12, Township 17 North, Range 4 East of the 6th P. M., Colfax County. He asserted ownership of island No. 1 by patent and mesne conveyances and the ownership of islands described in the record as Nos. 2, 3, and 4. Island No. 2 was described as south of Lots 2, 3, and 4 of Section 12 and south and west of island No. 1. Islands Nos. 3 and 4 were described as immediately west of or on the Colfax-Dodge County line and immediately south of island No. 1. He asserted that he derived his original title from the United States and is entitled to all the accretion to the real estate for the reason that he and his predecessors in title have at all times been riparian owners and are entitled to all of the real estate over which the Platte River flows with reference to the banks and the thread of the stream as they then existed; that he or his predecessors have not surrendered or lost any of their right to the real estate to the center or thread of the stream of the Platte River as it existed in the year 1857 when it was orginally surveyed, laid out, and recorded; that since that survey and more than 16 years ago islands Nos. 2, 3, and 4 to which he claims title were created from the bed of the river; that the real estate owned by him was during the year 1857 and has since been located north of the center or thread of the Platte River; that the principal portion of the stream of the river then flowed and now flows south of all the real estate above described and claimed by the cross-petitioner and he is entitled to have the title thereto quieted and confirmed in him; and that he and his predecessors in title have had continuous, notorious, and exclusive adverse possession of islands Nos. 2, 3, and 4 under claim of title for more than 10 years last past and for this addi-

tional reason he is entitled to have the title to the real estate quieted in him. He prayed for an appropriate adjudication by the court.

The substance of the answer and cross-petition of Koch was the assertion that he was the owner of the north half of the north half of the northeast quarter of the northeast quarter of Section 13 and the accretion thereto. The accretion is described as beginning at the northeast corner of Section 13, thence west along the north line of that section 1,440 feet, thence north at right angles to said north line to the center of the Platte River, thence east along the center line of the Platte River to the east line of said section as extended, and thence south along the east line of Section 13 to the point of beginning. Koch asserts that he made a lease with Young for the premises described in the lease, entered into possession and occupancy thereof, and paid to Young the rental as required by the terms of the lease until Koch obtained title to the premises by deed from Young and deed from W. A. Malovec and wife; that the adjudication made by the district court for Butler County in the case of Frank W. Barcal v. Milo Evans on September 6, 1930, was and is res judicata of all issues with respect to the lands between the Platte River and the north line of said Section 13; that the judgment in that case adjudicated the question of all lands between the north line of said Section 13 and the Platte River as being accretion land to said Section 13 and therefore plaintiff (appellant) has no valid right or claim to any of said land; that any claim asserted by him thereto is subject to and barred by the adjudication aforesaid; and that Koch and his grantors have had and maintained actual, open, continuous, and exclusive adverse possession of all said accretion lands, claiming title thereto for a period of 50 years last past. A judgment quieting title to the lands was the relief the cross-petitioner sought. Issue was joined by appropriate pleadings to the answers and cross-petitions.

The findings and judgment of the district court may be summarized as follows: That the judgment in the case of Frank W. Barcal v. Milo Evans in the district court for Butler County was not binding upon appellant; that the deed from W. A. Malovec and wife to Koch describing lands in Section 13 was ineffective for the reason that the grantors at the time of the conveyance had no right or title to the real estate described in the deed; that subsequent to the 1857 survey the Platte River moved southward so that all that part of Lot 5 east of a point 1,558.2 feet west of the southeast corner of Section 12 and all that part west of a point 2,690.2 feet west of the southeast corner of Section 12 washed away; that subsequent thereto accretion added to the south bank so that now all the river bank is north of the north line of Section 13; that the accretion attached to and became the property of the owners of the south bank; that the accretion that attached to the south bank west of a point 2,690.2 feet west of the southeast corner of Section 12 became the property of predecessors in title of Young; that all the accretion that attached to the bank between a point 1,558.2 feet west of the southeast corner of Section 12 and a point 2,690.2 feet west of the southeast corner of Section 12 became the property of the predecessors in title of appellant; that all the accretion that attached to the south bank for a distance of 1,440 feet west of the southeast corner of Section 12 became the property of the predecessors in title of Koch; that all the accretion to the south bank between points 1,440 feet and 1,558.2 feet, respectively, west of the southeast corner of Section 12 became the property of the predecessors in title of Young; that at the time of the formation of island No. 2, island No. 1 extended 500 feet westerly of its present position and at that time the thread of the river was north of island No. 2 but that the thread of the river between island No. 1 and the south bank of the river was south of islands Nos. 1 and 2; that plaintiff (appellant) failed to prove a right-

of-way or easement across the land of Young and plaintiff likewise failed to establish any right to a money judgment against Young; and that it was stipulated by the parties to the litigation that boundaries between the various tracts of accretion should be parallel to the east line of Section 12.

The judgment rendered by the district court quieted title to the accretion lands south of the river and north of Section 13 as follows: The east 1,440 feet of the accretion in Koch, the next 118.2 feet of the accretion in Young, the next 1,132 feet of the accretion in plaintiff, and the remaining accretion to the west line of Section 12 in Young. Title to island No. 2 was quieted in Young except for the part thereof east of a north-and-south line drawn 500 feet west of the west tip of island No. 2 and that part of the island was quieted in Peltz. Motions for a new trial were each denied and appellant has prosecuted this appeal.

The government survey of 1857 located Section 13, Township 17 North, Range 4 East of the 6th P. M., as what is now the northeast section in Butler County. The Platte River at that place was about a half mile in width and made a curve toward the east in its immediately previous northeasterly course. Section 12 was immediately north of Section 13 above described and was to a very considerable extent the bed of the river. The northwest portion of Section 13 was at the time of the survey riparian. The south bank of the river, because it was coursing to the north and east, crossed the north line of Section 13 more than one-fourth of a mile east from the northwest corner of Section 13. There was a wedgelike area of land between the north line of Section 13 and the south bank of the Platte River. It was surveyed and designated Lot 5 of Section 12, Township 17 North, Range 4 East of the 6th P. M. in Nebraska. It extended along less than the east three-quarters of the north section line of Section 13. The west point of it was where the river intersected the north line of Sec-

tion 13 and the east side was the east line of said Section 12. The survey represented the length of the lot from east to west as 52.48 chains. Frank W. Barcal became the owner of a part of Section 13 which was later transferred by his trustees to Young.

Appellant alleged he was the owner of Lot 5 of Section 12 including accretions thereto to the thread of the stream of the Platte River and was entitled to have the title thereto quieted. He offered as proof of his assertions in this respect a United States land grant or patent for Lot 5 dated June 28, 1937, issued to Henry M. Fleek; a deed from the patentee to Roy Wemmer and Joseph Zacek for Lot 5 dated December 13, 1945; and a deed from Joseph Zacek and his wife to Roy Wemmer for an undivided one-half interest in Lot 5 dated August 1, 1950. There were no restrictions as to accretions in these conveyances. Appellant refers to this evidence as a prima facie case as to the ownership by him of Lot 5 and the accretion thereto.

Appellant disputes the correctness of the findings of the trial court that the Platte River, by washing, eroded and obliterated large parts of Lot 5, thereby making considerable portions of Section 13 riparian, and that subsequent accretion attached to them became the property of the riparian owners. Appellant argues that there was insufficient evidence to establish southern encroachment of the Platte River to the high bank. The high bank of the Platte River was the location where the southern encroachment of the river ceased in the area involved in this case and the change in the elevation from the high bank to the lower ground to the north of it was estimated to be an average of about 5 to 6 feet. The high bank is somewhat discernible on a photostatic copy of an aerial map made in 1938 and it is definitely exhibited on the map of the Backlund survey which is a part of the evidence in this case. Appellees produced substantial evidence of the fact that the Platte River in the early part of the present century flowed

along and against the high bank. Louis Barcal, a witness produced and examined on behalf of appellees, said he was born in 1888 and was 68 years of age. His father bought the river farm in 1903 when witness was 15 years of age from William Husenetter. This land was later sold to Young and is involved in this case. Witness said he helped his father with the work on the farm for about 9 years and he visited it at various times thereafter until he moved to and lived on the land commencing in 1933. He was familiar with the high bank of the Platte River, part of which was on the farm and which extended from east to west about 200 feet north of the buildings thereon. The hay meadow on the farm extended to the edge of the high bank. North of the high bank in 1903 was water of the river all along the north end of the farm. The witness said, "In other words, the Platte River ran along the high bank in 1903." He moved off the land in 1946 and he said he had been there once or twice since. He stated that the high bank is some distance farther south now than it was in 1903. The water of the river flowed along it in 1903 and it did not in 1956. In the former year the water was "undermounting" the bank and it was falling in the river. Later the river started to move away from the high bank and it increased from the south toward the north, starting to leave sand there and working toward the north and also growing brush and trees along where the water had been. Witness said the high bank now is where the river left it.

Another witness, William Mallovec, also named in the record as W. A. Malovec, stated he was nearly 72 years of age, was a son-in-law of Frank Barcal, and had been familiar with what is referred to in the record as the Barcal farm in Section 13, Platte Township, Butler County, since 1908 and with the high bank of the Platte River, a part of which was on that farm. The high bank as it presently exists was, in his judgment, 400 feet farther south on the east half of the section than

it was in 1908. The water of the river in 1908 was along the high bank on the northeast part and a little off of the bank on the northwest corner. There was a little accretion between the high bank on the northwest corner and the river in 1908. It was not much. He could not estimate the quantity of the accretion. The water of the river was up against the high bank as it now exists until in the 20's the river left the high bank in that area approximately as it is now located.

A third witness, Joe Walla, testified that he was 70 years old, knew the location of Section 13, and was acquainted with the area and the part of the Platte River concerned in this case. He said he first visited the river and the area about the year 1900 and he last visited it in the summer of 1956. The south bank of the river washed away and most of the erosion was done in the "teens somewheres." The worst stage was then and the south bank was hit very hard. Later on the water receded and formed a bar and vegetation caught on and formed accretion. That was gradual. His best knowledge was that that was around the 20's. The high bank along there at Koch's place is about the same today as it was when the water left it. He said it seemed it about all came the same year gradually but at the west end a few years sooner.

Another witness, Frank Shavlik, related that his age was 70 years and that he lived all his life in Saunders County. He had knowledge of Section 13 described above, the location of the Koch cabin, and the location of the Young farm. He had been since he was a young man familiar with the Platte River in that area. He went to the river about every week from about the year 1915. During the early years of his experience there the water was from the south bank to island No. 1. In about 1916 and 1917 the river started to undermine the south bank and this continued, as he remembered it, until about 1920 when the water started to recede north from the high bank. He was married in

1922 and in June of that year he took a group to the river to swim opposite the Koch shack. They walked about 400 yards out to where the water was so they could swim. During those years there was a gradual receding of the river, a filling in, and sand bars formed and became visible.

The testimony of these long-time residents of the area of the fact of the encroachment of the Platte River to the high bank as it exists and has existed since about 1920 is substantially in agreement in all material and important aspects. There has been no attack made upon it by the production of other testimony of witnesses to dispute or disprove it notwithstanding about 6 years elapsed between the commencement of the case and the time of the trial. It is only said concerning these witnesses that their testimony is unreliable because there were some discrepancies as to dates of events related by them. They were elderly men who testified to events during their respective youths. Such variations as to events of at least 30 and up to more than 50 years ago may not destroy testimony which in its most important aspects is harmonious. This is especially true since it is not contradicted by other testimony. Appellant in this respect relied upon what he refers to as his prima facie case.

There is other evidence that the area north of the high bank was submerged by water more than 30 years ago as the witnesses produced by appellees asserted. Frank Pipal is an educated and experienced forester. He has a Bachelor's and a Master's Degree in that subject. He has practiced for more than half a century in that field. He was for more than 10 years the city forester for the city of Omaha. He testified he wrote his Master's thesis concerning cottonwood trees. That effort encompassed about 9 months. He said he could learn the age of trees, and especially cottonwood trees, by a ring-counting method. He walked through about two-thirds of the mile north of Section 13 and he watched while

driving in an automobile for the largest tree in the area. He found a 37-year-old tree near the Novak cabins on the Young land and a 31-year-old tree at or near the Koch cabin. These were the largest trees he could find. He explained the probable yearly growth of such trees in that area as indicating also the age and size of the trees on the accretion land. This evidence is undisputed and corroborates the testimony of the witnesses who testified concerning the encroachment of the Platte River to the south, its subsequent recession, and the later formation of accretion extending north from the high bank. Appellant comments on some uncertainty of the witness Pipal as to geographic orientation when he was at the river, but appellant furnished nothing in the case reflecting in any manner on his knowledge of trees or his ability to determine the age of them. Appellant made no appropriate attempt to weaken or overcome the significant information furnished by Pipal.

Appellant argues that appellees did not establish that the encroachment of the Platte River to the south to the location of the high bank was slow and gradual. He says this was a requirement if appellees are to prevail in the litigation. The record yields evidence to this effect: In 1903 the water of the river was undermining the south bank and it was falling in the river. There was an area of government land and the water took all of that away except a strip where Mat Fleek was located in about the middle of the section from east to west. The present location of the high bank is farther south than it existed in 1911 or 1912 because the bank was "undermounted" and fell in the river. (The word "undermounted" probably was intended to be "undermined.") The high bank at the time of the trial was where the river had washed it. Since 1908 the river had washed back over the east part of the section about 400 feet. The water quit cutting the bank after 1920. During the first World War the water along the south bank toward the east was about 8 feet deep. In the

years 1916 and 1917 the river was undermining and washing away the south bank of the river. It was then cutting over a distance estimated at 80 rods. About the year 1900 there was not a tree on the south bank or north of there to Murphy Island, described in the record as island No. 1. The water of the river was continuous from its south bank to its north bank. The worst stage of the washing of the south bank of the river was in the period of 1913 to 1920. The water hit the south bank hard in that period. Later the water receded and formed a great bar. Vegetation caught on and formed that accretion. The south bank of the river along Section 13 all receded to the south about the same time and the encroachment to the south discontinued after 1920. This evidence is substantially without contradiction. The language of the witness as to "undermounting" by the river, the bank being undermined by the river resulting in the soil being washed into the river, and the river receding until about the early 20's does not admit of uncertainty that the south bank of the river was destroyed by wearing or erosion by the water of the river slowly and gradually and not by an avulsion or a swift change in the course of the river. It is certain that when the Platte River by gradual process of wearing and washing of its south bank encroached upon Section 13, the owners of the land affected because thereof became riparian owners and the accretion thereto became the property of the then owners and their successors in title. The small part of Lot 5 of Section 12 which survived the encroachment of the river to the south commenced 1,558.2 feet west of the northeast corner of Section 13 and extended west 1,132 feet to a point on the north line of said section which is 2,690.2 feet west of the southeast corner of Section 13. The part of the lot which remained was at its widest point 67 feet from north to south and it commenced at a point on the east and extended to a point on the west.

The patent for Lot 5 was issued to Henry M. Fleek

June 28, 1937. The patentee is generally named in the record in this case as Mat Fleek. He lived down at the river as early as 1936. The Barcal land, afterwards conveyed to Young, was occupied and used by Louis Barcal at that time. The accretion north of substantially all of the west half of Section 13 was pasture and Louis Barcal ran cattle in the pasture which was fenced each of the years of 1933 through 1946. Mat Fleek made no objection thereto or assertion of right of ownership or possession of the land. He made no claim to the Barcal pasture. Barcal leased a part of the accretion land during that time to Novaks and four others for hunting and fishing purposes and they used it as the lease authorized. It is convincingly significant that the patentee was contented with the part of Lot 5 left after the encroachment of the river and that he made no assertion of right in him to the land which he apparently knew rightfully belonged to Barcal. It is more than slightly significant that Mat Fleek must have watched Novak and his associates use the lease, build a cabin on the accretion, install a well, and fish and hunt on the land without objection, protest, or resistance from him. It is a permissible, if not a necessary, conclusion that Mat Fleek knew he did not own the accretion and that it belonged to the Barcal land to which it was attached.

The evidence is not disputed that the accretion north of approximately all the west half of Section 13 was fenced and used by Barcal in the year 1933 and thereafter continuously through 1946 as a pasture for cattle. This use was continued until 1956 by Young, the purchaser of the land. A part of the accretion land was leased for hunting and fishing purposes for the period from August 23, 1933, to the time of the trial of this case to Novaks and four others. The accretion land was occupied and used by Young and his predecessors in title and those holding under them for the purposes for which it was adapted. Their possession was open, notorious, continuous, exclusive, and adverse under claim of right

and title for more than 10 years after the issuance of the Fleek patent. Title to land by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for a period of 10 years. The possession is sufficient if the land is used continuously for the purpose to which it is in its nature adapted. Cassens v. Wisner, 122 Neb. 408, 240 N. W. 526; Worm v. Crowell, 165 Neb. 713, 87 N. W. 2d 384.

There is no issue concerning the ownership of Lots 2 and 3 and the accretion to Lot 1 of Section 12, Township 17 North, Range 4 East of the 6th P. M. in Colfax County by Peltz. This land is on the north of the Platte River and extends from the east line of Section 12 three-fourths of a mile west. It is riparian to the river. Peltz is the only party to this litigation who owns real estate along the north bank of the river. The claim of ownership of real estate in the Platte River by appellant and appellees other than Peltz is based on their ownership of the fee title to the south bank of the river. Likewise the ownership by Peltz of Murphy Island or, as it is designated in this record, island No. 1, is not contested herein. The ownership of islands Nos. 3 and 4 was an issue in the case in the district court. Peltz claimed to own them because, as he asserted, they were riparian to island No. 1. Koch contended they were riparian to the land he owned south of them. Appellant claimed them because of his ownership of Lot 5. The issue as to the ownership of islands Nos. 3 and 4 has been eliminated as to appellees because Peltz has abandoned any claim in and to island No. 4 and he and his wife conveyed any interest they had therein to Koch. Likewise Koch has abandoned any claim in and to island No. 3 and he and his wife conveyed any interest they had therein to Peltz. There was a controversy in the district court as to the ownership of island No. 2. That issue was vigorously and extensively litigated. The district court determined that the part of island No. 2 west of a line 500 feet west of the west tip of island No. 1 was the

property of Young and the part of island No. 2 east of that line was the property of Peltz. There is no cross-appeal and the decision of the trial court in that respect is final. There is no issue between appellant, Young, or Koch with regard to the channels in the river since these parties each own land on the south bank of the river and their attitudes are identical.

Koch became the owner of the north half of the north half of the northeast quarter of the northeast quarter of Section 13, Township 17 North, Range 4 East of the 6th P. M. in Butler County, and the accretion land described as commencing at the northeast corner of Section 13, thence west along the north line of the section a distance of 1,440 feet, thence north at right angles to the said north line to the center of the Platte River, thence east along the center line of the river to the east line of Section 13 as extended, and thence south along the extended east line of Section 13 to the point of beginning, by a conveyance thereof to him by Young dated April 9, 1951. Koch had been in the possession of and he had used the area described by metes and bounds and in addition thereto a strip 118.2 feet immediately to the west thereof for several years before the conveyance last above described. The area extended west from the northeast corner of Section 13 a distance of 1,558.2 feet to the point where the high bank of the river and the north line of Section 13 intersected, thence north to the thread of the stream of the Platte River, thence east to the east line of Section 13, thence south to the place of beginning. It was claimed that there was incorrect information as to the distance from the northeast corner of Section 13 to the point of intersection of the high bank and the north line of Section 13 and that it induced a wrong description of the property intended to be conveyed to Koch by Young. The strip 118.2 feet wide above referred to has been since the trial of the case conveyed by Young to Koch and thereby

any issue concerning it between them has been resolved and requires no further notice herein.

The record is convincing that at some time after the government survey of 1857 the south bank of the Platte River as it then existed in said Sections 12 and 13 eroded southward by the action of the river; that all of Lot 5 in Section 12 was washed away except the part thereof bounded on the south by the south line of said Section 12 and extending from a point 1,558.2 feet west of the southeast corner of said section, thence westerly a distance of 1,132 feet; that so much of Lot 5 as it formerly existed east of the point 1,558.2 feet west of the southeast corner of said Section 12 and so much thereof as formerly existed west of a point 2,690.2 feet west of the southeast corner of said section was so washed away; that after the washing of the south bank it began to move northward by the process of accretion and now the south bank of the river lies north of the south line of Section 12 across that section; that the accretion attached and became the property of the owners of the south bank of the river at the time such accretion began; that the accretion to the south bank of the river west of a point 2,690.2 feet westerly of the southeast corner of Section 12 became the property of the predecessors in title of Young and by virtue of conveyances subsequently made is now owned by Ralph I. Young and Anna M. Young as joint tenants with right of survivorship; that the accretion which attached to that part of Lot 5 remaining after the southernmost erosion of the river bank described as a tract or parcel of real estate immediately north of and adjacent to the part of the south section line of Section 12 between a point 1,558.2 feet west of the southeast corner of said section and extending westerly therefrom along the south line a distance of 1,132 feet became the property of the predecessors in title of appellant and by virtue of conveyances subsequently made is now owned by Roy Wemmer, the appellant; that the accretion that attached

to the south bank of the river from the east line of Section 12 to a point 1,440 feet due west of the east section line became the property of the predecessors in title of Koch and by virtue of conveyances subsequently made has become and is the property of Harry A. Koch; and that the accretion that attached to that part of the south bank of said river between a point beginning 1,440 feet westerly of the east line of said Section 12 and extending westerly a distance of 118.2 feet became the property of the predecessors in title of Young and by virtue of subsequent conveyances was at the time of the judgment owned by Ralph I. Young and Anna M. Young as joint tenants with right of survivorship.

If by gradual erosion a river becomes the boundary of land, the owner thereof is a riparian owner and is entitled to all accretion thereof. If by the process of accretion and reliction the water of a stream gradually recedes, changes the channel of the stream, and leaves the land dry that was previously submerged by water, the land becomes the property of the riparian owner. The erosion of a river which cuts entirely across riparian land and into the land of an adjoining owner operates to destroy the title of him whose land was originally riparian and he may not reassert his title if the river reverses its traverse wanderings and new land is formed within what were his original boundaries. Worm v. Crowell, *supra.*

Appellant asserts a prescriptive easement in his favor across the Young land from the north-and-south highway on the west section line, east along the northern part of the Young property, to the land and cabin of appellant. He pleads that this means of ingress and egress to and from his property existed for as much as 40 years. He seeks to enjoin Young from interfering with the easement or its use as a road to and from the property of appellant.

Appellant is a resident of Omaha and has been a cattle dealer there for about 50 years. He says he went to

the area involved in this case in the year 1936. He was there then as a guest of Mat Fleek. When appellant began his visits to that location he testified that there were three routes available to him. His description of the courses of the routes was far from clear and certain. He claimed to have used each of them. As nearly as can be determined from his testimony one of the routes was from the east, one from the south which passed near the buildings of Barcal, and another from the west beginning with the first road in Butler County. This third route was in fact two, one north of the fence on the Young property and one south of the fence. Appellant traveled each of these routes as his convenience suggested. He continued to use all three ways to get to Mat Fleek's cabin. Before 1945 there was another road, which made four, according to the testimony of appellant. The course of the fourth route was not given by him. There were two roads eliminated and discontinued by Young without the consent of appellant and without objection, protest, or resistance from him.

There was a road in 1933 from the north-and-south highway along the west section line of Section 13 near the south or high bank of the Platte River. The testimony advises that it was a winding road extending to the east to the farm buildings on the Barcal land. There was a fence north of the road. The road was moved in 1934 several hundred feet south and it extended directly east and west. This was done by and for the convenience of Barcal or his tenant. The road then approached the farm buildings from the south and the old or former road was not used afterwards. Young became the owner of what had been the Barcal land and in 1947 a road was located to the north above the high bank. Since that time it has been the only road west of the farm buildings. That road was about a quarter of a mile north of the immediately former one. There was an entrance to the accretion through a gate in the fence. The orig-

inal gate was near the north-and-south public highway along the west line of Section 13. Young, when he took possession of the land, located a gate approximately 300 feet east of the old gate and the former gate was thereafter not used.

There were several persons who testified concerning a road, or more than one road, at the instance of appellant. There were only two of these persons who had made a trip into that area before this case was instituted on March 31, 1951. Gus Lindee, a resident of Omaha, said he had known appellant for about 38 years and was familiar with his hunting cabin on the Platte River. The witness was first there in about 1946. He had visited at the Mat Fleek cabin near the river about 1936. The route he followed to the Fleek place was by traveling on the highway west of Section 13. From there he said there was a road east on farms east of the section line. It turned east, went right down in Fleek's place, and went past it to the east. There were no gates on it. He could go north on the section-line road and turn east to the Fleek place without interruption. He said in later years he came from the east north of Koch's place, turned west, and went to the Wemmer place. And down through the years from 1936 until the fall of 1956 he used both routes, one from the west and one from the east. Neither of the routes he described was identifiable as a route of travel that was described by appellant in his testimony.

Witness Fred Pinnow, a resident of Omaha and an acquaintance of appellant since about 1923, said he was acquainted with the area where appellant has his hunting shack on the Platte River. Witness first went there about 1945 or 1946 when Mat Fleek was living in the area. He was there many times after appellant acquired the Fleek place and built his cabin. Witness said he traveled from the highway west of Section 13 on a road that went east to the Young buildings. It then made a swing, went through a yard, right on down to

the Wemmer shack, and right on east. He said there was no fence or gate across that road when he first used it. Later there was but he could not tell when. He said he afterwards traveled to the Wemmer cabin from the west and from the east but he did not attempt to describe the course he followed. The route from the west as he described it or the one from the east mentioned by him cannot be identified with any of the four routes mentioned or specified in the testimony of appellant. The most enlightening statement made by this witness was when he was asked where the fence along the road from the west was placed and he answered: "Various places. They sometimes made us turn in way down on the west end and drive up in the pasture and we went through the barnyard. There was never any certain way of going. You just got there."

The two persons who testified in an attempt to establish a prescriptive easement who had observed or experienced traveling conditions and routes to the cabin long enough before this case was commenced to be able to testify to right by prescription were appellant and Gus Lindee. Their testimony has been noticed and summarized above. Appellant spoke of several roads, at least four, and he mentioned five. Gus Lindee traveled a route indefinitely described from the west section line but whether it followed the high bank or went down to the accretion is not stated. He gave no specifications of the way of travel. Appellant employed any one of several ways in his travel as his convenience dictated. He made no claim of right to any of them. The evidence does not contain specifications sufficient to enable a court to locate and describe a prescriptive easement for the purposes claimed by appellant. The permissible inference from the record is that appellant used ways of travel to his cabin that were indicated by the farm owner or his tenant for the use and convenience of the Young farm. Appellant used these without claim of right and when a change was made in them by the

owner of the land, appellant utilized the new way without objection or argument. This practice persisted until this litigation had its inception. Then for some reason appellant sought to convert what had been an agreeable, friendly, and permissive use of a way of travel as a courtesy granted one neighbor to another into a roadway sanctioned and mandated by the court. This claim of appellant must fail because the proof is not sufficient to establish a prescriptive easement to his land or cabin from the west or from the east.

The proof concerning the claim of appellant of a prescriptive easement is equivocal, uncertain, and unsatisfactory. It is not of the quality that is required to establish such a right. A prescriptive easement is not looked upon with favor by the law and it is essential that all the elements of use and enjoyment necessary to give title to real estate concur in order to create an easement by prescription. The elements are adverse user under claim of right; continuous, open, exclusive, and notorious enjoyment and knowledge of the servient owner for the full prescriptive period; and identity of the thing being enjoyed. The proof must be clear, convincing, and satisfactory. Jurgensen v. Ainscow, 155 Neb. 701, 53 N. W. 2d 196; Dunn v. Thomas, 69 Neb. 683, 96 N. W. 142; Onstott v. Airdale Ranch & Cattle Co., 129 Neb. 54, 260 N. W. 556; Kuhlmann v. Platte Valley Irr. Dist., 166 Neb. 493, 89 N. W. 2d 768.

A sufficient obstacle to finding that appellant has the right he claims is the absence of clear, convincing, and satisfactory evidence of when the claimed period of adverse user began; from what place the user originated; the course of it on the land of what is claimed to be the servient estate; the identity of that course during the period required to establish an easement; and the quantity of land affected by the user. The law treats with disfavor a claim of prescriptive right based on adverse user and requires the elements to be clearly, convincingly, and satisfactorily established. A claimed ease-

ment must be viewed from both ends of the prescriptive period. The nature and extent of the scope of the user must from the beginning be clearly established. At the end of the period it must appear in retrospect that there has been no change or variance from the limits or course adopted or established at the beginning. A lesser user prevents a right to an easement and a greater user is of no importance until the full prescriptive period has elapsed from the initiation of the greater use. The law requires that the easement must be clearly definable and precisely measured.

In Dunn v. Thomas, *supra,* before considering the use had during the claimed prescriptive period, the court closely examined and defined the nature and extent of the use in the beginning. It also declared that a prerequisite to acquiring an easement by adverse user was that it must be continuous and substantially identical during the entire statutory period as to manner and extent. In that case the moving of the location of a ditch a short distance was considered sufficient to defeat the claim of an easement. The language of the case is: "In order to acquire an easement by prescription, the adverse user must not only be continuous in point of time, but also substantially identical, during the whole statutory period, with respect to manner and extent. * * * one who seeks to acquire an easement * * * over another's land by adverse user, must maintain it without material change of location for the full statutory period." See, also, Drieth v. Dormer, 148 Neb. 422, 27 N. W. 2d 843.

Fox v. Pierce, 50 Mich. 500, 15 N. W. 880, declares: "A right of way that is too indefinite for a determinate description cannot be established and protected by a court of chancery. * * * A bill to establish a right of way and to enjoin encroachments upon it cannot be sustained where it does not furnish the means for declaring exactly what the right is and the precise locality which it occupies with the shape and dimensions

thereof, and where the proofs show nothing but an oral agreement for its establishment, and such occasional variations in the bounds of the locality as to make it impossible to determine where it originally existed."

The language in Stubblefield v. Osborn, 149 Neb. 566, 31 N. W. 2d 547, may be appropriately applied to the present case: "In the instant case the evidence by the plaintiffs shows the original entry and use to have been permissive. The plaintiffs did not inform Bolton that they claimed a right-of-way and perpetual easement across his land. They crossed the land on occasions to go hunting, as did others. There was no claim of right or exclusive use. The most that can be said as to their crossing the lands in question is that it was permissive only, a neighborly act on the part of the owners or tenants on the land. There was no claim of ownership on the part of plaintiffs of such a nature that they openly and forcibly asserted directly against the actual owners of the land in such a manner that the owners would be required to take affirmative action against the plaintiffs. We have analyzed the cases cited by the plaintiffs as to the presumption arising where there has been open, visible, continuous, and unmolested use of a roadway across the land of another for a period exceeding ten years * * *. The cases cited by the plaintiffs in such respect show affirmative participation or negative acquiescence by the owner that placed him in a position that would make it properly necessary for him to establish the facts that the claims are inconsistent with his own acts of commission or omission." The evidence in this case fails to show any claim of right by appellant or negative acquiescence or affirmative participation by the owner of the land which placed him in a disadvantageous position.

Frank W. Barcal and his wife conveyed land owned by the former in Section 13 which was riparian to the river, with accretion thereto, to W. A. Malovec. The grantee and his wife subsequently reconveyed the land

to F. W. Barcal, who was the same person as Frank W. Barcal, but the last deed made no reference to accretion. W. A. Malovec was afterwards one of three trustees to whom the land was conveyed in trust by Frank W. Barcal and his wife. The trustees, as the trust deed authorized, sold and conveyed the land to Young. W. A. Malovec was one of the grantors in that conveyance. It was dated February 29, 1945. W. A. Malovec and his wife on January 10, 1951, made a deed to Koch for all the land between the north line of Lots 1 and 2 and the north half of the northeast quarter of Section 13 and the Platte River. It was contended at the trial that the last conveyance described above conveyed to Koch title to all the accretion to that section. The fact that the deed from W. A. Malovec and his wife to Frank W. Barcal did not describe the accretion that had formed to the land that was described in the deed was unimportant because the deed conveyed any accretion to the land which was specified in the deed. Accretion must be expressly excluded from a conveyance to avoid a transfer of it. Topping v. Cohn, 71 Neb. 559, 99 N. W. 372; Mulhall v. State, 140 Neb. 341, 299 N. W. 481. The trial court correctly adjudicated that the deed to Koch was a nullity because the grantors had no interest at the time of the conveyance in the land therein described.

Koch contends that the judgment rendered on September 6, 1930, in case No. 4373 in the district court for Butler County in which Frank W. Barcal was plaintiff and Milo Evans was defendant determined all questions with respect to the lands between the Platte River and the north line of Section 13 and adjudicated that said lands were accretion. Koch alleged that any claim of appellant thereto was subject to the judgment of the court in that case. The trial court denied that contention and Koch has prosecuted a cross-appeal. There were only two parties to that case. Appellant was not a party thereto and makes no claim under or through

either of the parties to that case. What was decided or adjudicated in that case did not affect or bind appellant. State v. Chicago, R. I. & P. Ry. Co., 61 Neb. 545, 85 N. W. 556, stated on this subject: "It is a maxim of general jurisprudence that a party is not concluded by a judgment or decree rendered in an action to which he was not a party." See, also, Agnew v. Montgomery, 72 Neb. 9, 99 N. W. 820; In re Estate of Vetter, 142 Neb. 167, 5 N. W. 2d 215; Hanks v. Northwestern State Bank, 143 Neb. 204, 9 N. W. 2d 175. The conclusion of the trial court in this respect was correct and the cross-appeal may not be sustained.

Appellant complains that his motion for a new trial on the ground of newly discovered evidence was improperly denied. The alleged newly discovered evidence said to have been made aware of after the trial and an adverse adjudication was that the United States government had made a survey of Lot 5 of Section 12 in 1928 and again in 1932. These alleged facts were discovered by investigation and inquiry made by counsel of appellant after the trial and apparently between June 14, 1957, the date of the rendition of the judgment, and June 22, 1957, the date of the filing of the motion of appellant for a new trial, an assignment of which was newly discovered evidence material for the plaintiff which he could not with reasonable diligence have produced at the trial. There is no claim that discovery could not have been made before the trial or that any effort to that end was made. It is not said that the surveys were concealed or hidden from anyone or that the facts concerning them could not have been secured at any time by proper request therefor. Appellant became interested in this property in 1945. He commenced this case in March 1951 but the trial of it was not had until the year 1957. The evidence claimed to have been recently learned of had existed for more than 25 years. The facts of any survey made by the government are shown by public record. The failure of

litigant·to investigate such possible source of information falls far short of the reasonable diligence required as a condition of securing another trial because of newly discovered evidence. § 25-1142, R. R. S. 1943. Newly discovered evidence is not in itself reason for another trial of a cause if diligence before the trial of the case would have discovered the alleged newly discovered evidence. The law will not intervene to assist a litigant who has not exercised due diligence to prevent the result of which he complains and which is attributable to his inattention. Jensen v. John Hancock Mutual Life Ins. Co., 145 Neb. 409, 16 N. W. 2d 847; Grosse v. Grosse, 166 Neb. 55, 87 N. W. 2d 900. The motion for a new trial because of this assignment was properly denied.

The manner in which this court considers and decides an equity case has been frequently stated. Keim v. Downing, 157 Neb. 481, 59 N. W. 2d 602; Worm v. Crowell, *supra*. The trial court inspected the premises and the physical matters involved after the evidence at the trial was concluded and before it arrived at a conclusion in the case. This court may in an·equity case give proper consideration to the fact that the trial court inspected the premises and the physical matters involved and that its examination thereof constituted evidence because the relevant facts observed necessarily affected the mind of the court and tended to influence belief or unbelief on the matters at issue in the case, if there is other competent evidence in the record to sustain the findings. Keim v. Downing, *supra;* Worm v. Crowell, *supra*.

The parties to this case stipulated that all north-and-south boundaries found to exist between the parcels of real estate owned by them should be parallel to the east line of Section 12, Township 17 North, Range 4 East of the 6th P. M. in Butler County. The stipulation was observed by the trial court in the decision rendered herein.

.The findings of the trial court are sustained by the record and they are adopted by this court as its findings. The cross-appeal of Koch should be and it is denied. The judgment should be and it is affirmed.

AFFIRMED.